[No. A117853. First Dist., Div. One. June 16, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
TOMELIA DILLON, Defendant and Appellant.

[No. A119292. First Dist., Div. One. June 16, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
DAMIEN DANARI HALL, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

___

\*Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II.A.4., II.A.5., II.B., and the first sentence of part III.

## COUNSEL

Richard C. Neuhoff and Barbara A. Zuras, under appointments by the Court of Appeal, for Defendant and Appellant Tomelia Dillon.

Dennis P. Riordan and Donald M. Horgan, under appointments by the Court of Appeal, for Defendant and Appellant Damien Danari Hall.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Mark S. Howell, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**MARGULIES, J.**—A jury convicted defendant Tomelia Dillon of grand theft from the person, assault by means of force likely to produce great bodily injury, and misdemeanor battery, arising from his encounter with a young woman who became lost in downtown San Francisco during a New Year's celebration. The jury convicted Dillon's codefendant, Damien Danari Hall, of assault with intent to commit sexual penetration with a foreign object, arising out of the same encounter. On appeal, defendants contend that their convictions are the result of instructional and other errors committed in the course of their joint trial. We affirm the judgments against both defendants, but return both matters to the trial court for the correction of minor clerical errors in the abstracts of judgment.

# I.  BACKGROUND

Defendant Hall was charged by information with forcible sexual penetration with a foreign object (Pen. Code,[1] § 289, subd. (a)(1); count I) and sexual battery (§ 243.4, subd. (a); count II). The same information charged defendant Dillon with second degree robbery (§ 212.5, subd. (c); count III), assault by means of force likely to produce great bodily injury (§ 245, subd. (a)(1); count IV), and misdemeanor battery (§ 242; count V). Counts IV and V were accompanied by enhancement allegations that Dillon had been released on bail or his own recognizance when he committed those offenses (§ 12022.1). Hall and Dillon pleaded not guilty to the charges, and Dillon denied the special allegations.

A jury trial for both defendants commenced on November 28, 2006.

## A.  *Prosecution Case*

On December 31, 2005, Antoinette B. was 19 years old and lived in San Ramon. That evening, she and about six friends took BART (Bay Area Rapid Transit) from San Ramon to celebrate New Year's Eve in San Francisco. They arrived in San Francisco about 9:30 or 10:00 p.m. They went from the BART station to the Galleria Hotel, where one of her friends had reserved a room for the night. Antoinette and her friends checked into the hotel, put their belongings in the room, and then went outside to look around the city. Antoinette had been in San Francisco only once before, a few months earlier. She had not stayed at the Galleria Hotel previously and was not familiar with that part of the city.

Antoinette and her friends walked around looking at buildings and restaurants, but they did not eat. About midnight, while walking through a restaurant, Antoinette lost her cell phone. She never found it again. Antoinette and her friends ushered in the new year near a large Macy's store that they had walked to, before returning to the hotel. While some of Antoinette's friends went to a restaurant in the hotel for a few drinks, Antoinette remained outside, smoking a cigarette.

While she was outside smoking, Antoinette got a call on a cell phone she had borrowed from someone in her group. The call was from a friend named Albert, who was with a separate group that had arrived in San Francisco later than her group. Albert indicated that he was near a clock tower. She tried to ask her friends in the Galleria restaurant for directions to the hotel that she could give to Albert, but there was too much noise and commotion.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

Antoinette was also slightly intoxicated and "buzzed," although not to the point that she was incoherent or did not know what was going on. While still on the phone with Albert, Antoinette started walking toward what she believed to be his location. She understood that Albert and his friends would be walking toward her.

Antoinette and Albert continued talking on the cell phone from time to time as she tried to find him. She walked away from the Galleria Hotel and came to a 7-Eleven store. Near the 7-Eleven, Antoinette came upon several police officers at an intersection. She asked them for directions but she was unsure of the street names and did not understand what they were telling her. Then she came to a BART station. The location seemed similar to the location Albert was describing, but she could not find him. Albert told her he was still walking, trying to find the Galleria. Antoinette decided to return to the hotel to wait for him there. She asked some people how to get to the Galleria Hotel, but she got conflicting directions and did not know which way to go. She started walking in a direction that she felt would take her back to the hotel.

Three men approached Antoinette and offered directions. She did not remember asking any of the men for directions. Dillon spoke to her first. One of the men told her she was walking in the right direction. She continued walking and then sensed that the men were following her. They continued to talk to her even though she did not talk to them or encourage them in any way to walk with her. She told them at least three times to stop following her. She was very nervous, and scared of the men. Trying to get away from them, Antoinette quickly crossed in midblock to the other side of the street. The men continued following her.

Shortly after she crossed the street, the three men surrounded her. Dillon was to her left, and Hall, who was initially toward her right side, ended up behind her. She was carrying her purse, which she described as "a little bag," on one of her shoulders and was holding her friend's cell phone. Antoinette was on the phone, telling Albert that he had to come help her because she was being followed and the men would not leave her alone, when Dillon grabbed the phone out of her hand. She did not remember what Dillon did with the phone, but she never saw it again. After Dillon took the phone, Hall reached around Antoinette from behind and pinned her arms to her sides. Antoinette, who was five feet one inch tall and weighed 90 pounds, tried to free her arms and get away from Hall, but could not. Hall was bigger than Antoinette but she did not know how tall he was.

Against her will, Hall put one of his hands into her shirt and placed it on Antoinette's left breast, under her bra. After that, he slid his hand down her

jeans, unbuttoned them, and pulled down her zipper. He stuck his hand into her pants below her underwear, skin to skin. She did not want him to do that, had not asked him to do that, and had no amorous feelings for Hall. Antoinette started crying and screaming for them to let her go and crying out for help, but no one came to help her. As he moved his hand down under her underwear, Antoinette believed that the tip of Hall's finger may have penetrated the outside of her vagina for a few seconds, although his finger never fully entered into it.[2] After a few seconds, Hall removed his hand from her pants and let her go. She asked the men why they would do that to someone, but could not remember getting any response.

Antoinette zipped up and buttoned her pants and walked back across the street where there were more people. Dillon, Hall, and the third man continued to follow her. Antoinette was still crying and asking people on the street for help. Dillon told her not to ask anyone for help and would shove her when she stopped and tried to ask for help. At the corner next to the Grand Hyatt hotel, Dillon gave Antoinette a strong kick on her upper right thigh when she asked a woman for directions. He said, "You're not going to ask people for help." He then said something to the effect that she was going to make him some money, and she did not need to talk to anyone on the street or ask for help or directions. A couple of seconds later, Dillon reached for Antoinette's purse on her shoulder and grabbed it. As he grabbed it off her shoulder, she ran toward the Hyatt's revolving door entrance. She was scared for her life and thought people inside the hotel would help her. As she reached the revolving doors, Dillon came up behind her, grabbed her hair, and pulled her back. Her legs and feet were dragging on the sidewalk. At that point, a hotel security guard approached, and Dillon ran off.

About 1:00 a.m. on January 1, 2006, Grand Hyatt security guard Pablo Molina was checking the identification of persons entering the hotel's elevators to confirm that they were guests of the hotel. He was stationed about 10 feet from the hotel doors on Stockton Street. He heard a loud bang and, shortly after, a female voice screaming. He could see a lot of people in the lobby looking toward the glass doors, so he headed toward the doors. He looked out and saw a female being dragged on the sidewalk by her hair. He saw a male with his hands on the female's hair dragging her in the direction of Sutter Street. The male was over six feet tall, African-American, and weighed over 200 pounds. Molina came out of the hotel and ran toward the female. The male released her and ran in the direction of Sutter Street. Molina picked up the female and carried her inside the hotel.

---

[2] Antoinette later testified that the tip of Hall's middle finger was touching the opening of her vagina, but did not enter or penetrate it.

The parties stipulated to the playing of a security camera videotape taken of the front of the Grand Hyatt hotel on January 1, 2006, beginning at 1:11 a.m. The video showed Dillon following Antoinette and pulling Antoinette's hair with one hand. The video also showed Dillon with Antoinette's purse in his other hand.

Two off-duty Alameda County Sheriff's deputies, Curtis Nelson and Shawn Christiansen, and their wives, were sitting and talking in the lobby of the Grand Hyatt hotel shortly after 1:00 a.m. on January 1, 2006. The deputies heard a loud banging type of noise when something hit the window at the entrance to the Hyatt. This was followed by a woman screaming. Both deputies ran outside. Outside there was a young woman on the sidewalk, with a group of people gathered around her and a hotel security guard kneeling beside her, trying to comfort her. Nelson asked the woman what had happened and she provided a description of a Black male with a bald or shaved head, wearing a light-colored shirt. Nelson ran to the corner and looked up Sutter for anyone matching the description. He spotted Dillon, who matched the description, walking up Sutter at a fast pace. Nelson ran up to him, tapped him on the shoulder, identified himself as an Alameda County Sheriff's deputy, and said he had reasonable cause to believe that Dillon had been involved in an incident in front of the Grand Hyatt. He told Dillon that he needed to return with him to the Grand Hyatt to sort things out. At that point, Dillon pulled a pink purse from under his shirt, handed it to Nelson, and said, "You got me."

As Nelson was walking down Sutter toward the hotel with Dillon, Dillon pulled out of Nelson's grasp, turned, and sprinted up Sutter. Hall was nearby but Nelson had not noticed him. As Nelson started to chase Dillon, Hall lowered his shoulder into Nelson's chest and knocked Nelson into the side of a building. Deputy Christiansen observed what happened and he and Nelson chased Dillon and subdued him when he tripped and fell a short distance away. San Francisco police officers stopped Hall nearby.

Antoinette made an in-field identification of both men around the corner from the hotel at 1:50 a.m. Antoinette identified her purse. It contained some makeup, but no money.

B. *Defense Case*

Hall lived in Suisun City with his girlfriend and two children. He testified that about 8:00 p.m. on December 31, 2005, he and his childhood friend, Tomelia Dillon, decided to drive to San Francisco. They drove first to the Tenderloin area where they bought some liquor and drank some with friends they ran into, eventually meeting up with another friend, known to Hall as

"Mr. Chill." Hall, Dillon, and Mr. Chill then walked toward the Union Square area and headed toward the Embarcadero. They heard chimes ringing in the new year before reaching the Embarcadero.

Eventually, the trio headed back up Market Street. Dillon was acting very "forward" and "abrupt" with people, causing Hall to actually apologize for him a few times. Hall felt "buzzed" from the alcohol he had consumed, but not heavily drunk. Hall first saw Antoinette B. standing alone near Sutter and Market Streets holding a champagne glass. She appeared to him to be "real bubbly, real . . . . Just, like, a really nice person."

After Dillon and Mr. Chill began talking to Antoinette, Hall joined them. They had a pleasant conversation and were flirting with each other. They were standing perhaps six inches apart, facing each other. At some point, she turned around and backed into him. He put both of his arms around her abdomen. She grabbed one of his hands with a gentle touch and began to rub it against her belly. Hall began to slide his left hand down the front of her pants until Antoinette said, "Stop." When she said that, Hall immediately took his hand out and backed up. He had gotten his hand under her pant line only up to his knuckles when she told him to stop and he withdrew his hand. Hall had not unbuttoned or unzipped Antoinette's pants. He had meant to stick a finger in her vagina, "[i]f it ever got that far."

When Hall backed away from her, Antoinette looked at him and laughed. Hall said, "Okay, whatever." After that, Antoinette turned away from him and crossed the street. Hall started walking up Sutter to Montgomery where he saw Antoinette across the street, walking with Dillon. It looked like they were talking, but Hall could not really tell. When they got to Stockton and Sutter, Hall was about 40 feet behind them. He noticed something was going wrong. He could not really tell what led to it, but he saw Antoinette swing a purse at Dillon. Dillon then grabbed the purse, she started to run toward the Hyatt hotel, and Dillon ran after her. Hall ran to see what was going on and saw Antoinette on the ground with a security guard attending to her.

Hall went to look for Dillon and spotted him running away from the Hyatt with someone running after him. Hall started walking in their direction. He saw Dillon walking back toward the hotel with the man who had been chasing him. As the two of them came by Hall, Dillon spun around Hall and started running back up the block. Hall felt someone bump him from the back. He saw the man who bumped him fall against the wall and then take off after Dillon. A few minutes later, Hall was detained by some motorcycle officers.

Dr. Nikolas Lemos is the forensic laboratory director and chief forensic toxicologist for the Office of the Chief Medical Examiner for the City and

County of San Francisco. Lemos testified that Antoinette B.'s urine sample revealed that in the timeframe of her encounters with Dillon and Hall, she had taken an undetermined amount of cocaine. This could have come from cocaine-laced marijuana that Antoinette testified she used several days before the incident, although Lemos did not consider this likely. Antoinette also used marijuana, but it was possible she had ingested it several days before the incident.

The level of alcohol found in Antoinette's urine indicated that she had a blood-alcohol level of 0.17 percent around 1:30 a.m. on New Year's morning. Lemos estimated that to arrive at that level of blood alcohol, Antoinette had to have consumed between eight and one-half and nine alcoholic drinks, each containing one and one-half ounces of 80 proof alcohol. This meant that Antoinette was intoxicated at the time of her encounters with Hall and Dillon at a level at which the average person's inhibitions are depressed, and the person's abilities to process stimuli, to understand and respond to events, and to judge and remember a situation are all impaired.

Stephen T. Conley, Jr., a hotel owner who had known Hall for 17 years and served as his mentor in a youth program, testified that Hall was "incredibly honest," had a "deep conscience," and knows when he has done something wrong. Conley further testified that he knew Hall was not aggressive with women and in fact is "sort of the opposite." Vanda Marlow, another mentor of Hall's, had opinions similar to those expressed by Conley.

Lateefah Simon, an old friend of Hall's and the director of the San Francisco District Attorney's Office's placement program for first offenders, testified that Hall was a person of honesty and integrity. She had never observed Hall to behave in an aggressive, assaultive, or inappropriate manner with women.

## C.   *Verdicts, Sentences, and Appeal*

The jury returned verdicts finding Hall not guilty of forcible sexual penetration with a foreign object as charged in count I, and not guilty of the lesser included offense of attempted sexual penetration with a foreign object. However, the jury did find Hall guilty of the lesser included offense of assault with intent to commit penetration of the genital opening of another person by a foreign object (§ 220). On count II, the jury found Hall not guilty of sexual battery.

Dillon was found not guilty of second degree robbery in count III, but the jury found him guilty of the lesser included offense of grand theft from the person (§ 487, subd. (c)). Dillon was found guilty as charged on counts IV

and V (assault by means likely to cause great bodily injury, misdemeanor battery). The trial court dismissed the jury without any determination of the on-bail enhancements alleged against Dillon.

The trial court sentenced Hall to the mitigated term of two years for his conviction. The court sentenced Dillon to the middle term of three years on count IV, eight months or one-third the middle term for the lesser included grand theft conviction under count III, to be served consecutively, and six months in the county jail on count V, to be served concurrently with Dillon's state prison sentence.

Timely appeals by both defendants followed. On the People's motion, we consolidated the appeals for purposes of briefing, oral argument, and decision.

## II. DISCUSSION

### A. *Hall's Appeal*

Hall contends that the trial court erred in instructing the jury on the lesser included offense of which he was ultimately convicted—assault with intent to commit forcible sexual penetration. In particular, Hall maintains that the instruction as given failed to inform the jurors that (1) lack of consent was an element of the offense; and (2) even if the complainant failed to consent, the defendant could not be convicted if there was reasonable doubt about whether the defendant reasonably but mistakenly believed the victim had consented. In the alternative, Hall argues that because the offense requires a specific intent to act against the will of the complainant, the jury should have been instructed that even his unreasonable belief in the complainant's consent constituted a defense to it.

#### 1. *Instructions Given*

The jury was given the CALCRIM instruction on forcible sexual penetration (CALCRIM No. 1045, as modified),[3] followed immediately by the CALCRIM instruction on assault with intent to commit forcible sexual penetration (CALCRIM No. 890, as modified),[4] and printed copies of the instructions were handed to the jury to use in their deliberations. Those instructions, with the portions relevant to the issues before us italicized, are as follows:

---

[3] Forcible sexual penetration is defined in section 289, subdivision (a)(1) as "an act of sexual penetration . . . accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury."

[4] Assault with intent to commit forcible sexual penetration is defined in section 220, which makes it a crime to "assault[] another with intent to commit mayhem, rape, sodomy, oral copulation, or any violation of Section 264.1, 288, or 289."

CALCRIM No. 1045, as given: "Damien Hall is charged in Count 1 with sexual penetration by force. *To prove that the defendant is guilty of this crime, the People must prove that* (1) the defendant committed an act of sexual penetration with another person; (2) the penetration was accomplished by using a foreign object; (3) *the other person did not consent to the act*; and (4) the defendant accomplished the act by force, violence, duress, menace, or fear of immediate and unlawful bodily injury to anyone.

"Sexual penetration means penetration, however slight, of the genital opening of the other person for the purpose of sexual abuse, arousal, or gratification. A foreign object, substance, instrument, or device includes any part of the body except a sexual organ. Penetration for sexual abuse means penetration for the purpose of causing pain, injury, or discomfort.

"*In order to consent, a person must act freely and voluntarily and know the nature of the act.* Evidence that the other person requested, suggested, communicated that the defendant use a condom or other birth-control device is not enough by itself to constitute consent.

"An act is accomplished by force if a person uses enough physical force to overcome the other person's will. Duress means a direct or implied threat of force, violence, danger, hardship, or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something that he or she would not otherwise do or submit to. When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the other person and her relationship to the defendant.

"Menace means a threat, statement, or act showing an intent to injure someone. An act is accomplished by fear if the other person is actually and reasonably afraid or if she's actually and unreasonably afraid and the defendant knows of her fear and takes advantage of it. The defendant is not guilty of forcible sexual presentation [*sic*] if he actually and reasonably believed that the other person consented to the act.

"*The People have the burden of proving beyond a reasonable doubt that the defendant did not actually and reasonably believe that the other person consented. If the People have not met this burden, you must find the defendant not guilty.*" (Italics added.)

CALCRIM No. 890, as given: "Damien Hall is charged in Count 1 with sexual penetration by a foreign object through force or violence. A lesser included offense of sexual penetration by a foreign object is assault with intent to commit the penetration of the genital opening of another by a foreign object.

"To prove the defendant is guilty of this crime, the People must prove that [(1)] the *defendant did an act that, by its nature, would directly and probably result in the application of force to a person*; (2) the *defendant did that act willfully*; (3) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act, by its nature, would directly and probably result in the application of force to someone; (4) when the defendant acted, he had the present ability to apply force to a person; and (5) *when the defendant acted, he intended to commit the penetration of the genital opening of another by a foreign object.*

"*Someone commits an act willfully when he or she does it willingly or on purpose. The terms application of force and apply force mean to touch in a harmful or offensive manner.* The slightest touching can be enough if it is done in a rude or angry way. Making contact with another person, including through his or her clothing, is enough. The touching does not have to cause pain or injury of any kind. The touching can be done indirectly or by causing an object or someone else to touch the other person.

"The People are not required to prove that the defendant actually touched someone. No one needs to actually have been injured by the defendant's act. But if someone was injured, you may consider that fact along with all the other evidence in deciding whether the defendant committed an assault and, if so, what kind of assault it was.

"*To decide whether the defendant intended to commit the penetration of the genital opening of another by force, please refer to the instruction which defines that crime, which is the instruction labeled CALCRIM 1045.*" (Italics added.)

### 2. Lack of Consent Instruction

■ Hall first contends that the pattern instruction for assault with intent to penetrate the genital opening of another by a foreign object was deficient for failing to specify as part of the instruction itself that the People had the burden of proving lack of consent. As Hall correctly points out, section 220 requires not only the specific intent to commit the underlying sexual act, but a specific intent to commit that act without the consent of the victim. (See *People v. Davis* (1995) 10 Cal.4th 463, 509 [41 Cal.Rptr.2d 826, 896 P.2d 119] [an " 'essential element' " of assault with intent to commit rape and of assault with intent to commit sodomy is " 'the intent to commit the act against the will of the complainant' "]; *People v. Soto* (1977) 74 Cal.App.3d 267, 278 [141 Cal.Rptr. 343] [" 'To support a conviction for assault with intent to commit rape, the prosecution must prove the assault and an intent on the part of defendant to use whatever force is required to complete the sexual act against the will of the victim.' "].)

But we do not view CALCRIM No. 890 in isolation. "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from [one] particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251], overruled on other grounds in *People v. Reyes* (1998) 19 Cal.4th 743, 753 [80 Cal.Rptr.2d 734, 968 P.2d 445].) Here, the instruction used specified that a required element of the assault offense was that the defendant intended to commit the crime of penetration of the genital opening of another by a foreign object. To determine whether that element was satisfied, it instructed the jury to refer to "the instruction which defines *that crime*" (italics added), i.e., the crime of penetration of the genital opening of another by force, as defined in CALCRIM No. 1045. CALCRIM No. 1045, in turn, specifies that the complainant's lack of consent is a necessary element of the crime of penetration of the genital opening of another by force. A reasonable juror reviewing CALCRIM No. 1045, as instructed by CALCRIM No. 890, would conclude that unless he acted against the will or consent of the complainant, Hall could not have held the specific intent to commit the crime of penetration of the genital opening of another by force, and therefore could not be guilty of the lesser included assault offense as defined in CALCRIM No. 890.[5]

Hall claims that the jurors were "entitled to assume" that in fact no specific intent was required for them to convict him under section 220, because the court never listed assault with the intent to commit sexual penetration as a specific intent crime, even though it did tell jurors that to be guilty of forcible sexual penetration by foreign object and sexual battery, "a person must not only intentionally commit the prohibited act but must do so with a specific intent or mental state" that would be "explained in the instruction for each crime." But in describing the two types of wrongful intent (in accordance with CALCRIM No. 252), the court was addressing only the charged crimes. It did not purport to discuss or classify the intent required for any of the lesser included offenses. The court's silence on those offenses in the context of CALCRIM No. 252 did not in any way entitle or induce jurors to assume that no specific intent was required for them to convict him under section 220, when the instruction for that offense specified that he had to have the intent to commit the crime of forcible sexual penetration.

---

[5] The comparable CALJIC instructions operated in exactly the same fashion. The assault instruction, CALJIC No. 9.09, also does not mention any specific intent to act against the complainant's will, but merely states the requirement that the defendant act *with the specific intent to commit the underlying crime.* The use note for CALJIC No. 9.09 then references the instructions pertaining to each underlying crime, including CALJIC No. 10.30 for forcible sexual penetration. That instruction in turn defines the crime of forcible sexual penetration, in relevant part, as "an act of sexual penetration *when the act is accomplished against [the] [a] victim's will* by [means of force, violence, duress, menace or fear of immediate and unlawful bodily injury on the victim or another person]." (Italics added.)

Hall further maintains that because CALCRIM No. 1045 fails to define the intent required for the crime of forcible sexual penetration, the jury would be unable to determine from looking at CALCRIM No. 1045 whether the defendant had the intent to commit that offense when he performed the act constituting the assault. As Hall and the People both agree, and contrary to the trial court's instruction under CALCRIM No. 252, forcible sexual penetration is a general intent crime. The defendant need not harbor the intent to commit a crime as long as he intended to commit the act or acts constituting the crime. But the mental state required to be found guilty of forcible sexual penetration is not the same as the specific intent to commit that crime. (See, e.g., *People v. Jones* (2003) 29 Cal.4th 1229, 1257–1258 [131 Cal.Rptr.2d 468, 64 P.3d 762] [felony-murder instruction requiring specific intent to commit the general intent crime of rape did not require contradictory mental states; even if the jury found the defendant did not act with the specific intent to rape, it could still have found him guilty of rape].)[6] Reading CALCRIM No. 1045 to determine the intent required under CALCRIM No. 890, jurors would reasonably conclude that if the prosecution failed to prove the complainant's lack of consent, the defendant could not be guilty of assault with intent to commit forcible sexual penetration.

◼ In our view, CALCRIM Nos. 890 and 1045, taken together, adequately instructed the jurors that they had to find a lack of consent before they could convict Hall for assault with intent to penetrate the genital opening of another by a foreign object.

◼ In any event, the issue of whether the trial court should have modified CALCRIM No. 890 by adding lack of consent language to it is not properly before us because Hall never proposed such a modification. Instead, defense counsel requested an instruction under *People v. Mayberry* (1975) 15 Cal.3d 143 [125 Cal.Rptr. 745, 542 P.2d 1337] (*Mayberry*), discussed below, which is related to but distinct from a lack of consent defense.[7] (*People v. Rivera* (1984) 157 Cal.App.3d 736, 743 [203 Cal.Rptr. 842].) " 'The trial court cannot reasonably be expected to attempt to revise or improve accepted and correct jury instructions absent some request from counsel.' " (*People v. Kelly* (1992) 1 Cal.4th 495, 535 [3 Cal.Rptr.2d 677, 822 P.2d 385].)

---

[6] Although the issue was not raised in *People v. Jones*, we note that the time-tested felony-murder instruction in issue, CALJIC No. 8.21, does not include language regarding lack of consent when the underlying felony is rape, sodomy, or forcible sexual penetration.

[7] This request was apparently made at an unreported conference. If Hall is contending that he requested an instruction modifying CALCRIM No. 890 to add language covering *both* lack of consent *and* the *Mayberry* defense, he has failed to meet his burden of establishing that in the record.

### 3. Mayberry *Instruction*

■ Hall next contends that CALCRIM No. 890, as given, was deficient under *Mayberry*. *Mayberry* held that when the record contains sufficient evidence of a defendant's reasonable belief in the complainant's consent to a sexual act, the jury must be instructed to find the defendant not guilty unless the prosecution proves beyond a reasonable doubt that the defendant did not actually and reasonably believe the complainant consented. (*Mayberry, supra,* 15 Cal.3d at p. 157.) There is no dispute here that a *Mayberry* instruction was given in connection with the charged offense of forcible penetration with a foreign object, as shown above by the italicized, concluding paragraph of CALCRIM No. 1045 provided to the jury. Hall also requested the trial court to give *Mayberry* instructions with respect to all potential lesser included offenses of the two charged offenses, but the trial court declined the request.

According to Hall's new trial motion, the court declined the request because it believed that the language in CALCRIM No. 890, referring jurors back to CALCRIM No. 1045, adequately covered its obligation to instruct on reasonable belief in consent as a defense under section 220. In our view, the court's failure to give *Mayberry* instructions in connection with both CALCRIM Nos. 1045 and 890 does not constitute reversible error for the following reasons: (1) the evidence was insufficient to warrant a *Mayberry* instruction under either section 289 or section 220; (2) if such an instruction was required, the reference to CALCRIM No. 1045 in CALCRIM No. 890 adequately informed jurors that Hall's reasonable belief in the victim's consent was a defense to the lesser included offense of assault with intent; and (3) any deficiency in that regard was cured when counsel for both sides joined in closing argument in explaining to jurors that a reasonable belief in the complainant's consent would be a defense to the lesser included offense.

■ A *Mayberry* instruction is not required in every case in which a defendant charged with a sexual offense offers consent as a defense. (*People v. Williams* (1992) 4 Cal.4th 354, 362, fn. 7 [14 Cal.Rptr.2d 441, 841 P.2d 961] (*Williams*).) *Mayberry* is a "mistake of fact" defense, which requires evidence showing that the defendant perceived facts differently from how they actually existed. (*Williams,* at pp. 361–362.) A *Mayberry* instruction "should not be given absent substantial evidence of *equivocal conduct* that would have led a defendant to reasonably and in good faith believe consent existed *where it did not.*" (*Williams,* at p. 362, italics added.) Thus, in *Williams,* the court found that a rape defendant was not entitled to a *Mayberry* instruction where he testified that the complainant "initiated sexual contact, fondled him to overcome his impotence, and inserted his penis inside herself," while the complainant testified that the sexual encounter occurred only after the defendant "blocked her attempt to leave, punched her in the eye, pushed her onto the

bed, and ordered her to take her clothes off, warning her that he did not like to hurt people." (*Ibid.*) The court found that the defendant's testimony, if believed, *established actual consent* whereas the complainant's testimony, if believed, would *preclude any reasonable belief in consent. (Ibid.)* The court reasoned that "[t]hese wholly divergent accounts create no middle ground from which [the defendant] could argue he reasonably misinterpreted [the complainant's] conduct." (*Ibid.*) The court reaffirmed the rule stated in previous appellate cases that the *Mayberry* instruction should not be given if the " 'defense evidence is unequivocal consent and the prosecution's evidence is of nonconsensual forcible sex.' " (*Williams*, at p. 362, quoting *People v. Burnett* (1992) 9 Cal.App.4th 685, 690 [11 Cal.Rptr.2d 841].)

This case presents a similar scenario. Hall testified about his encounter with Antoinette as follows: When he first saw her, Antoinette seemed "real bubbly" and had a "nice personality." He asked her for her name and she told him. She willingly walked along together with him and his friends, and never said, "Stop following me" or anything like that. At some point, when Hall's friends were no longer walking with them, Antoinette stopped and faced Hall. The two of them began flirting with each other, "saying little innuendo things," and teasing each other. Antoinette told him she thought he was "cute" and accepted compliments from him about how she looked. They were standing six inches apart, facing each other, when Antoinette turned her back to him and pressed herself against him. He responded by putting his arms around her abdomen. When he did that, she took one of his hands "with a gentle touch," and began to rub it against her belly. According to his testimony, Hall did not touch Antoinette's breast. He did begin to slide his hand down the front of her pants, and got his fingertips under her pant line about to the level of his knuckles, before she told him to stop. She said "stop" only once, in a "[v]ery subtle" tone of voice, and she made no move to push him away.[8] He removed his hand immediately and let go of her. When he did, she turned around and looked at him, gave him a slight laugh, and crossed the street. He was not troubled about her saying "no" and just continued on his way. A few minutes later he caught sight of her walking up ahead with Dillon in an apparently friendly manner.

If Hall's testimony is taken at face value, his interactions with Antoinette were entirely consensual. By his account, she flirted with him, told him he was cute, initiated physical contact with him in a sexually suggestive fashion, and made him run his hand over her belly. Although he started to slide his hand under her pants without asking permission, he stopped as soon as she spoke the word "stop" in a "[v]ery subtle" tone of voice. She made no move

---

[8] Hall testified as follows on cross-examination: "Q. How did she say 'stop'? [¶] A. More like 'Stop.' You know it wasn't, like, 'Stop' or 'Stop.' It was just, like, 'Stop.' [¶] Q. A very soft 'Stop'? [¶] A. Very subtle 'Stop.' [¶] Q. She said it once? [¶] A. Yeah."

to flee or push him away at that point; he was the one who withdrew from their physical contact. She immediately turned toward him and laughed. By Hall's account, Antoinette's reaction to what had transpired between them was one of bemusement. There was no anger, flight, fear, or sign of revulsion. In fact, one could infer from Hall's testimony that Antoinette laughed to tease him for letting go of her. In sum, if Hall's description of her reaction to him is to be believed, it negates rather than supports any possible inference that she was offended or displeased about their physical encounter.

We need not review Antoinette's testimony in detail. She presented a starkly different picture in which nothing she said or did in responding to Hall and his friends could possibly be mistaken for consent, and nothing Hall did could be confused with an innocent misunderstanding of her wishes. Just as in *Williams*, Hall's testimony here, if believed, established Antoinette's consent to everything he admitted doing, whereas Antoinette's testimony, if believed, precluded reasonable belief in her consent to any physical contact with him whatsoever. There was no middle ground from which Hall could reasonably argue that her conduct was ambiguous and led him to do something that turned out to be offensive to her. Accordingly, no *Mayberry* instruction was required in connection with either the charged offense or the lesser included offense of which Hall was ultimately convicted.

■ Even assuming contrary to the evidentiary record that a *Mayberry* instruction was warranted, we find that the instructions as a whole adequately informed jurors that they could not find Hall guilty of assault with intent to commit forcible penetration by a foreign object unless the prosecution proved that he did not actually and reasonably believe Antoinette had consented. As stated in *People v. May* (1989) 213 Cal.App.3d 118 [261 Cal.Rptr. 502], the crime of assault with intent to commit rape requires the specific intent to have intercourse " 'against the victim's will.' " (*Id.* at p. 128.) If the jury finds the defendant harbored a reasonable belief in the alleged victim's consent, it must find that he lacked the specific intent to commit rape. (*Id.* at pp. 128–129.) The same is true of forcible sexual penetration and the related assault crime defined under section 220. Here, the trial court instructed the jury to review CALCRIM No. 1045 to decide whether Hall intended to commit the penetration of the genital opening of another by force. CALCRIM No. 1045, in turn, informed jurors that Hall could not commit the crime of forcible sexual penetration if he actually and reasonably believed that Antoinette consented to being digitally penetrated by him. In addition to the *Mayberry* instruction to which CALCRIM No. 890 referred the jurors, CALCRIM No. 890 itself instructed jurors that in order to find Hall guilty of assault with intent to commit the penetration of another by a foreign object, they would also have to find that he willfully applied force to Antoinette, meaning that he "willingly or on purpose" touched her in a manner that was "harmful or offensive" to her. Based on its verdict, we can infer that the jury in fact made that

finding. Apart from the *Mayberry* instruction, if the jury was convinced by the evidence that Hall willingly or on purpose touched Antoinette in a manner that was harmful or offensive to her it is hard to imagine how it could have at the same time harbored doubt about whether Hall reasonably believed the touching was consensual.[9]

Any presumed doubt jurors may have had about the applicability of the *Mayberry* instruction to the lesser included offense of assault with intent to commit forcible penetration would have been cured by the closing arguments of both counsel. Defense counsel told jurors: "In Mr. Hall's case what I want to tell you is that it's pretty easy to decipher how you can decide all of these [lesser included charges]. These are listed up here, all the charges. And that is if you believe that [Hall] reasonably believed that Antoinette consented to the act, it's a defense to all of them. . . . [¶] . . . I'm pointing this out . . . because my feeling is the jury instructions aren't terribly clear in this area. So if you have any questions about it, I encourage you to send out a note and ask the Judge for further clarification . . . ." A few minutes later, the prosecutor affirmed that defense counsel was correct on that point: "So the first lesser included is assault with intent to commit a sex offense. Now again—and it was indicated, you know, if he has a reasonable belief that this was consented to, it is a defense. *There's no doubt about that.* But there's no reasonable interpretation that he had that belief." (Italics added.) There is no evidence in the record that the jury sought clarification about any aspect of the *Mayberry* instruction or its application to the lesser included offenses.

We therefore reject Hall's argument that it was prejudicial error for the court to decline to repeat the *Mayberry* instruction in connection with both the charged offense and the assault offense of which he was convicted.

4., 5.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

[9] Hall proffers purported evidence that the jurors were actually misled by the instructions, consisting of three juror declarations that he submitted with his motion for a new trial. He concedes that unspecified portions of the declarations that describe the jurors' reasoning are inadmissible under Evidence Code section 1150, but insists that other unspecified portions, assertedly recounting statements made by jurors during deliberations, may be considered by this court. (See *In re Stankewitz* (1985) 40 Cal.3d 391, 397 [220 Cal.Rptr. 382, 708 P.2d 1260]; *People v. Perez* (1992) 4 Cal.App.4th 893, 906–907 [6 Cal.Rptr.2d 141].) In fact, each substantive paragraph in the three declarations begins with the phrase, "[t]he jury verbally discussed and agreed," and then purports to explain how the jurors allegedly understood the relevant instructions and arrived at their verdicts. The declarations are plainly inadmissible under Evidence Code section 1150. (See *People v. Danks* (2004) 32 Cal.4th 269, 301–302 [8 Cal.Rptr.3d 767, 82 P.3d 1249].)

[*] See footnote, *ante,* page 1367.

B. *Dillon's Appeal*[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## III. DISPOSITION[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

Subject to the abstract of judgment corrections specified in the nonpublished part of this opinion, the judgments against Hall and Dillon are affirmed.

Marchiano, P. J., and Graham, J.,[†] concurred.

Petitions for a rehearing were denied July 13, 2009, and the opinion was modified to read as printed above. The petitions of all appellants for review by the Supreme Court were denied September 30, 2009, S174938.

---

[*]See footnote, *ante*, page 1367.

[†]Retired judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.