Filed 12/17/18

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| UN SUK GUERNSEY, by and through her Conservator, CARA GUERNSEY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF SALINAS et al., <br><br> Defendants and Respondents. | H043283 <br> (Monterey County <br> Super. Ct. No. M126693) |

A driveway into the Westridge Shopping Center meets North Davis Road at a T-intersection in the City of Salinas (City). A 12-foot-wide crosswalk runs across the driveway on City property. The crosswalk was originally painted in 1997 and never repainted. A City ordinance provided that the City "shall . . . maintain crosswalks at intersections . . . by appropriate . . . marks . . . ."[1] (Salinas Municipal Code, § 20-43.) By 2013, the crosswalk had "faded" considerably. In 2013, plaintiff Un Suk Guernsey was crossing the driveway in the faded crosswalk when a truck that was turning left from

---

[1]     Salinas Municipal Code section 20-43 provides: "The city traffic engineer shall establish, designate, and maintain crosswalks at intersections and other places by appropriate devices, marks, or lanes upon the surface of the road-way, as follows: Crosswalks shall be established and maintained at all intersections within the central traffic district; and at such other intersections outside of such district and at other locations within or outside of such district as are designated by any ordinance or resolution."

North Davis Road into the driveway struck and severely injured her. Guernsey and her husband[2] sued the City, Celia Capulin (the driver of the truck), and others. Guernsey's action against the City alleged that the City's property was in a dangerous condition. (Gov. Code, § 835.)

At the jury trial, over Guernsey's objections, the court gave a special "[d]esign of the [d]riveway" jury instruction requested by the City, refused to give jury instructions requested by Guernsey on negligence per se (CACI No. 418) and mandatory duty (CACI No. 423) based on the City ordinance, and provided the jury with a special verdict form containing two fact-specific questions on dangerous condition to which Guernsey objected. The jury returned a multi-million dollar verdict against Capulin, but it found for the City on the two fact-specific dangerous condition questions. The jury wrote on the verdict form: "Paint the xwalk Salinas!" The trial court awarded the City its expert witness fees under Code of Civil Procedure section 998 after finding that the City's $250,000 pretrial offer was reasonable.

On appeal, Guernsey contends that the trial court prejudicially erred by (1) giving the City's requested "[d]esign of the [d]riveway" instruction, (2) using the two fact-specific dangerous condition questions on the special verdict form, (3) refusing to give the mandatory duty and negligence per se instructions, and (4) awarding the City its expert witness fees. We conclude that the trial court prejudicially erred in giving the City's requested "[d]esign of the [d]riveway" instruction over Guernsey's objections. We therefore reverse the judgment in favor of the City.

## I. Evidence Presented At Trial

The crosswalk across the driveway was originally painted in 1997 with 12-inch-wide lines consisting of thermoplastic paint. Thermoplastic material lasts for five to 10

---

[2] We will refer to plaintiffs as Guernsey since their interests do not diverge.

2

years. By 2013, the crosswalk's lines had faded so much that they "weren't visible" but for some "remnants" near the curbs. It costs about $1,000 and takes about an hour to repaint a crosswalk.

The City's Municipal Code requires it to maintain its crosswalks, but the City has no program for inspecting them. Instead, maintenance is "[l]argely complaint driven." The City adopted the Caltrans Traffic Manual, which became the "MUTCD" (Manual on Uniform Traffic Control Devices), and it requires crosswalks to have solid white lines, no less than 12 inches wide. The City knew that the failure to maintain crosswalk lines could be dangerous to pedestrians because the purpose of crosswalk markings is to warn motorists to expect pedestrians at that location.

Next to the crosswalk was a 16-foot-wide strip of pink stamped concrete that also went across the driveway. The pink concrete was not on the City's property, nor was it controlled by the City. The stop sign for traffic exiting the driveway onto North Davis Road was not next to the crosswalk but in the pink concrete area, about 11 feet from the crosswalk. On the north side of the intersection, next to the driveway's entrance lane, tall bushes hanging over the sidewalk limited the ability of a driver of an exiting vehicle to see southbound traffic. Most of the bushes were not on the City's property, but the City had the authority to require that the owner of the bushes trim them or to have them trimmed and charge the owner. The City did not trim the bushes or require them to be trimmed. No prior pedestrian accidents had occurred at the intersection between the driveway and North Davis Road.

On February 8, 2013, Darel Sorenson was in his vehicle heading toward the driveway's exit when he saw Guernsey approaching from his right. She was "on the sidewalk" 15 to 20 feet away from Sorenson's vehicle "down at the other end" by North Davis Road. He stopped his vehicle "prior to the stop sign." Guernsey crossed the driveway in the crosswalk in front of Sorenson's vehicle, looked at him, "jogged in place

3

a second or two" in front of his vehicle and then continued northbound.  Sorenson proceeded to the stop sign and then looked to his left and saw Guernsey on the ground.

Capulin was driving a GMC pickup truck northbound on North Davis Road. She got into the left turn pocket to turn left into the driveway into Westridge Shopping Center.  The left turn pocket had no signal or stop sign.  Capulin was familiar with the intersection because she had been going to the Costco in the shopping center at least monthly for more than a decade.  She had exited the driveway "hundreds of times." Capulin brought her truck to a stop because there was southbound traffic.  After the southbound traffic passed, several vehicles exited the driveway by making right turns onto North Davis Road.  Her view of the sidewalk was blocked because there were vehicles exiting the driveway that had pulled up to see whether southbound traffic was coming.  Before Capulin turned, she saw the pink concrete, which she considered to be one of the "walkways or crosswalks" because she had "always seen people walk on that." She did not see any painted crosswalk lines, but she "knew there possibly had been a crosswalk there prior" where the "faded lines" were.  After waiting for a southbound "straggler" vehicle to pass, Capulin looked to her left, looked to her right, and then proceeded to make her left turn.  As she turned, she was looking ahead to the "pink crosswalk."  The next thing she saw was "something flying from my left," which was Guernsey.  Guernsey was already in the crosswalk when Capulin began her left turn. Capulin felt a "thud" against her truck, and her truck "rolled forward" for "a few seconds" before she saw Guernsey lying there and stopped her truck.

Guernsey suffered a "severe traumatic brain injury," numerous orthopedic injuries, a collapsed lung, a lacerated liver, and other injuries.  She was in a coma for a month, and she will require 24-hour care for the rest of her life.  Guernsey is primarily wheelchair-bound and has only a limited ability to communicate.

4

The only cause of action against the City that was submitted to the jury was Guernsey's third cause of action for a dangerous condition of public property.  In her opening statement, Guernsey asserted that the City "created this dangerous condition by failing to maintain the crosswalk."  The City admitted in its opening statement that "[t]he crosswalk lines are faded."  Capulin's trial counsel asserted in opening statement that the intersection was "confusing" because of "the pink," and that "the pink," the bushes, and the stop sign location could have "played a role" in the accident.

The causes of the accident were hotly contested at trial.  Guernsey's experts identified several factors that could have contributed to the accident.  The six-inch-wide "A-pillar" in Capulin's truck created a blind spot that obstructed Capulin's vision of objects to the left of her truck.  Due to the bushes, a vehicle exiting from the driveway would have to move forward from the stop sign into the crosswalk to see whether there was southbound traffic coming.  The faded crosswalk created different expectations for a pedestrian than for a driver.  While a pedestrian would reasonably expect the crosswalk to be a "safe zone" once she had entered it, the absence of plainly visible crosswalk markings would cause a driver's attention to be drawn to the visually distinct pink cement area, particularly since that is where the stop sign required vehicles to stop.  Thus, the "completely faded" crosswalk "created a very confusing visual environment" for "left-turning vehicles."  In contrast, had there been a clearly visible "marked crosswalk," it would have created a "visual cue" for a driver to watch for pedestrians in the crosswalk.

After Guernsey's case-in-chief, the court denied the City's motion for nonsuit on the dangerous condition cause of action, but it noted what it perceived to be weaknesses in Guernsey's case on that cause of action.  The City's experts testified that the crosswalk markings were not responsible for the accident.  In their view, the presence or absence of crosswalk markings would not influence the accident rate at an intersection.  However, "[i]f drivers don't see a crosswalk and have no idea there's a possible crossing there,

5

then, yes, drivers may be less responsive to pedestrians." A City expert asserted that this intersection did not need a "marked crosswalk" and crosswalk lines would be "very useless" to a driver because a driver would be able to see only a small part of the painted lines.[3] He conceded that a car would have to pull up into the crosswalk in order to see around the bushes while exiting the driveway. Yet he insisted that neither the crosswalk, which had received in his view "poor maintenance," nor the untrimmed bushes created a dangerous condition.

Capulin's expert testified that the most reasonable explanation for the accident was that an exiting vehicle had blocked Capulin's view of Guernsey, who he concluded had gone behind the vehicle because the vehicle was blocking the crosswalk due to the driver's need to look past the overgrown bushes. Alternatively, this expert believed that Capulin's view of Guernsey was blocked by the "straggling car" that was proceeding southbound.

At the City's request, and over Guernsey's objections, the court instructed the jury: "Plaintiffs have not alleged that the design of the Driveway created a dangerous condition. Instead, Plaintiffs have alleged that it was the City's failure to maintain the crosswalk lines and the bushes that created a dangerous condition. [¶] To find that the Driveway presented a dangerous condition, you cannot rely on characteristics of the Driveway itself (e.g., the placement of the stop sign, the left turn pocket, and the presence of the pink cement). Although you can consider those elements of the Driveway when weighing whether or not the faded crosswalk lines and bushes created a dangerous condition, you cannot rely on those design elements of the intersection to find that a dangerous condition existed." The court also instructed the jury with the following

---

[3] Nevertheless, he testified that the City should repaint the lines if it was going to keep the crosswalk or remove them if it did not want to keep the crosswalk and that the City should have the bushes trimmed.

6

instruction, to which both parties agreed: "The City of Salinas' property may be considered dangerous if a condition on adjacent property, such as the pink stamped concrete or the location of the stop sign, exposes those using the public property to a substantial risk of injury in conjunction with the adjacent property."

The verdict form, which was provided to the jury over Guernsey's objections, contained questions 2a and 2b about the City's liability for a dangerous condition, with the word "or" between the two questions. Question 2a asked: "Was the property in a dangerous condition at the time of the incident because of the lack of crosswalk lines and/or bushes on the City's property? [¶] ___ Yes ___ No." Question 2b asked: "Was the property in a dangerous condition at the time of the incident because of lack of crosswalk lines and/or bushes in conjunction with one or more conditions on adjacent property? [¶] ___ Yes ___ No [¶] If yes, check one or both: [¶] ___ Pink concrete [¶] ___ Location of stop sign."

Guernsey's trial counsel argued to the jury: "The City of Salinas did not maintain the crosswalks. [¶] The faded lines make the pink walkway more prominent, and the overgrown bushes created a dangerous condition, which led to the dangerous condition, and an inattentive driver that went in to the crosswalk, striking Mrs. Guernsey." She argued that Capulin "saw the pink concrete and thought the pink was the crosswalk." Her argument was that the faded crosswalk lines made Capulin mistake the pink concrete for the crosswalk. This created a dangerous condition because a pedestrian in the crosswalk was closer to a left-turning driver than a pedestrian in the pink concrete walkway would be. She also relied on the City's failure to "trim the bushes down to three feet" because the bushes "blocked the view of the southbound traffic . . . ." "I just wanted to remind you that we're not talking about the design of this intersection. [¶] It's the lack of maintenance, that the driveway was in this dangerous condition. [¶] In relationship to the placement of the stop sign and pink cement and the left turn pocket, the situation, the entire situation out there, but with specific factors that we have discussed, particularly the

7

pink." She specifically addressed how the jury should respond to questions 2a and 2b on the verdict form.

The City argued to the jury that the faded crosswalk lines and the bushes had not been a substantial factor in causing the accident. "As you have seen, you can say this crosswalk's stripes were faded, but it was not a cause of this accident." The City also argued: "[D]id the crosswalk stripes and the bushes that were part of the City and the bushes that were part of Costco and the pink cement that was part of Costco and Sammut Brothers, the developers, did the stripes in conjunction with those -- was that a substantial factor in Mrs. Guernsey's accident? [¶] And the answer is no." It argued that Guernsey was responsible for the accident. Capulin's trial counsel argued that Guernsey had not been in the crosswalk but "in the pink" when Capulin began her left turn.

During deliberations, the jury initially submitted three questions to the court. One of them sought " 'a legal definition of "dangerous condition"?' "[4] The parties agreed that the answer to this question was to refer the jury back to CACI No. 1102. The jury subsequently submitted a fourth question: " 'What is the difference between a "substantial risk" as opposed to a "minor risk"? Is there a legal definition for these terms?' " The court responded: "That is actually a question that you must decide based on the evidence that you have heard in this case and with reference to the instruction that you have been given, and I think you have a copy of it. It's the one that's marked '1102' at the top, which reads 'A "dangerous condition" is a condition of public property that creates a substantial risk of injury to members of the general public when the property is used with reasonable care and in a reasonably foreseeable manner. A condition that creates only a minor risk of injury is not a "dangerous condition." Whether the property is in a dangerous condition is to be determined without regard to whether Celia Capulin or Un Suk Guernsey exercised or failed to exercise reasonable care in her use of the

---

[4] The other two questions concerned the MUTCD.

8

property.'" Finally, the jury asked: "'Do we need to answer both questions when presented with the word "or"? Examples are questions 2(a) 2(b) and question 6. Do we answer both or one?'" The court responded: "the answer is both."

The jury thereafter returned its verdict. On questions 2a and 2b, which concerned whether the property was in a dangerous condition, the jury answered both questions "No." The jury found that Capulin had been negligent, that Guernsey's damages were over $7 million, that Capulin was 70 percent responsible, and that Guernsey was 30 percent responsible. The jury was polled, and all 12 jurors affirmed that this was their verdict. After the jury had been polled, the foreperson asked if he could "say something on behalf of the jury." He said: "Please paint the crosswalk lines." The court pointed out that the same message was also written on the verdict form, which said "P.S. Paint the xwalk Salinas!" The court entered judgment on the jury's verdict in December 2015.

Guernsey subsequently brought a motion for a new trial as to the City. She argued that (1) the verdict form's questions 2a and 2b, which asked whether the City's property was in a dangerous condition, erroneously "narrowed" the jury's dangerous condition inquiry; (2) the "[d]esign of the [d]riveway" instruction was prejudicially erroneous; (3) the trial court's refusal to give CACI No. 418 and CACI No. 423 was prejudicially erroneous; and (4) the court failed to give appropriate responses to the jury's questions. Her motion relied on numerous juror declarations. The court denied the new trial motion and awarded the City its expert witness fees as costs under Code of Civil Procedure section 998. Guernsey timely filed a notice of appeal from the judgment and the costs order.

## III. Discussion

Guernsey contends that the trial court prejudicially erred in instructing the jury with the City's "[d]esign of the [d]riveway" instruction.

9

## A. Background

In response to Guernsey's dangerous condition cause of action, the City pleaded as an affirmative defense in its answer that the physical conditions of the intersection had not changed after the approval of its design. This affirmative defense is commonly known as design immunity. When the City moved for summary judgment, Guernsey argued, among other things, that the design of the intersection was not reasonable. Guernsey's trial brief argued that the left turn pocket, the pink concrete, and the location of the stop sign were factors, along with the faded crosswalk lines and the bushes, in causing the accident.

At the commencement of trial, the City's trial counsel expressed confusion about whether Guernsey was pursuing her allegations of "defective design," and Guernsey's trial counsel told the court that she was "not saying the design caused the dangerous condition" so "design immunity doesn't come in to [*sic*] play." She said that she was pursuing only "failure to maintain for which there is no immunity." The City's trial counsel asked whether Guernsey was "going to argue the location of the stop sign is a causative factor in this accident, defective and it caused -- or the left turn lane channelling lane, the curb radius and so on." Guernsey's trial counsel responded that "the stop sign is still at issue" because it was on adjacent property and the City "would be liable for having a condition on their property in conjunction with [a] dangerous condition on adjacent property." The City's trial counsel sought confirmation of his "understand[ing]" that "there are going to be no jury instructions on defective design." Guernsey's trial counsel confirmed as much and said that "the whole design process . . . [that] goes into design immunity . . . we're not doing that." The City's trial counsel responded: "It's more clear."

The City subsequently asked the trial court to exclude "design defect" evidence by precluding Guernsey's trial counsel from asking questions about various aspects of the intersection that the City claimed were relevant only to the intersection's "design."

10

Guernsey's trial counsel argued that evidence about the "pink . . . walkway" and "the stop sign" was properly placed before the jury because the City could not "get design immunity for" "items" that "are on private property." She disclaimed any contention that the left turn pocket, which was on the City's property, was "defective." She explained: "[W]e are not saying that defect in the design, the original design of public property, caused the incident. [¶] It's the failure to maintain the crosswalk line[s] and the existence of the pink concrete, the stop sign, they all just explain what happened in the situation with the various drivers, the pedestrian, the site obstructions, what have you." She confirmed that her position was that "this is a dangerous condition of public property because of the failure to maintain the crosswalk lines, because of the crosswalk lines being in disrepair, then the adjacent property of the public's property contributes to the perception of the driver and what they are perceiving in terms of what's the pink, what's not the pink, where is someone going to be crossing." The court denied the City's motion.[5]

At trial, one of Guernsey's experts testified that the "intersection" was a "dangerous condition" due to (1) the "disintegrated paint" on the crosswalk, (2) the "confusion" arising from the stop sign's location in the pink cement area, (3) the fact that the pink cement was eye-catching and immediately adjacent to the crosswalk, and (4) the untrimmed bushes that made it difficult for drivers exiting the driveway to see southbound traffic without pulling up into the crosswalk. He expressed the opinion that a left-turning driver "wasn't really warned this is a crosswalk." He also testified that the placement of the stop sign contributed to confusion about where the crosswalk was located. This expert testified that the faded crosswalk was a factor in causing this accident, particularly because it was next to the "more prominent" pink cement. On

_____

[5] During the trial, the City objected at times to "design testimony," and some of its objections were sustained.

11

cross, he said that the confusing factors were the "combined" impact of the faded crosswalk, the pink cement, and Sorenson's "stopping" twice.

The City requested a "[d]esign of the [d]riveway" instruction stating: "Plaintiffs have not alleged that the design of the Driveway created a dangerous condition. Instead, Plaintiffs have alleged that it was the City's failure to maintain the crosswalk lines and the bushes that created a dangerous condition. [¶] To find that the Driveway presented a dangerous condition, you cannot rely on characteristics of the Driveway itself (e.g., the placement of the stop sign, the left turn pocket, and the presence of the pink cement). Although you can consider those elements of the Driveway when weighing whether or not the faded crosswalk lines and bushes created a dangerous condition, you cannot rely on those design elements of the intersection to find that a dangerous condition existed."

Guernsey's trial counsel objected to the City's proposed "[d]esign of the [d]riveway" instruction on the ground that it was unnecessary. She proposed an "alternative" instruction: "Plaintiffs have not alleged that the design of North Davis Road, including the crosswalk, created a dangerous condition. Instead, Plaintiffs have alleged that it was the City's failure to maintain the crosswalk and the bushes that created a dangerous condition. Plaintiffs have also alleged that the crosswalk may be considered dangerous if a condition on adjacent property, such as the pink stamped concrete and the location of the stop sign, exposed those using North Davis Road to a substantial risk of injury. [¶] To find that the intersection presented a dangerous condition, you cannot rely on the design characteristics of the intersection itself (e.g., design decision on the location of the left turn pocket)."

During the instruction conference, the court asked Guernsey's trial counsel "[w]hat are you going to be arguing the 'dangerous condition' is?" Guernsey's trial counsel replied: "The failure to maintain the crosswalk lines" "in combination with the bushes." The City argued that its proposed "[d]esign of the [d]riveway" instruction was necessary to "clarify" that "the location of the stop sign is not an issue for us, the pink

12

cement is not an issue for us." The court suggested that the City's proposed instruction "would be pretty important to avoid the confusion." The City argued: "The jury has heard all that evidence, and it needs to be clarified for them that the location of the stop sign -- without saying it, that that location of the stop sign, the left turn channel, and so on are not -- not being alleged to have been the cause of this accident, and this instruction does that[.]" The court agreed with the City: "I think it's very confusing to the jury to -- well, confusing to everyone, I think, that the Plaintiffs can use all the design factors to talk about the dangerous conditions but is not asserting dangerous design, and I think that the jury will -- I think the jury will look to the individual design elements and some will be upset about the placement of the stop sign, and some will be upset wi[th] the left turn pocket, some will be upset about the pink cement." The court therefore granted the City's request and instructed the jury with the "[d]esign of the [d]riveway" instruction.

### B. "Design of the Driveway" Instruction Was Erroneous

Guernsey contends that the trial court erred in giving the "[d]esign of the [d]riveway" instruction because the instruction was "irrelevant" and "ambiguous," and it "repeated and thus unduly emphasized factors the jury could not rely on to find a dangerous condition." (Italics omitted.) The City claims that the instruction was required because the jury needed to be informed that Guernsey was not claiming that the City was liable based on the design of the intersection so that the jury would not premise liability on the intersection's design.

The City contends that Guernsey forfeited her challenges to the "[d]esign of the [d]riveway" instruction by failing to object on these grounds below. "It is settled that a party may not complain on appeal that an instruction correct in law is too general or incomplete unless he had requested an additional or qualifying instruction." (*Agarwal v. Johnson* (1979) 25 Cal.3d 932, 948, disapproved on a different point in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 574, fn. 4.) "A party may, however, challenge on

13

appeal an erroneous instruction without objecting at trial." (*Lund v. San Joaquin Valley Railroad* (2003) 31 Cal.4th 1, 7.) Guernsey objected below that the instruction was "misleading," not "necessary," and confusing because "[w]e're not going on design," and the instruction "makes it sound like the City should be entitled to design immunity . . . ." She also objected that the instruction was "erroneous" because it "does not take into account adjacent property liability and the fact that a dangerous condition can exist because of the adjacent property . . . ." Guernsey does not complain on appeal that the "[d]esign of the [d]riveway" instruction was too general or incomplete; she claims that the instruction was erroneous. We conclude that she did not forfeit her objections to this instruction.

The City argued below, and the trial court agreed, that the "[d]esign of the [d]riveway" instruction was necessary to inform the jury that Guernsey was not premising liability on the City's design of its property. Yet the instruction was not limited to providing just that information. Guernsey's proposed alternative instruction was so limited. Instead, the City's instruction went on to implicitly presume that the City had established that it was entitled to design immunity without that issue ever having been presented to the trial court and, critically, to extend this presumed design immunity to elements of the driveway that were not on the City's property and therefore could not properly have been the subjects of the City's presumed design immunity.[6] As Guernsey

---

[6] "The usual methods for raising a design immunity defense are motion for summary judgment [citation]; motion for nonsuit [citation]; motion for directed verdict [citation]; or a combination of these motions [citation]. On submitting such motions, the trial court is invited, and is in a position, to rule whether the evidence is sufficient to support the design immunity defense [citation]. If the trial court determines that the defense has been established, the jury is instructed that the public entity is immune as a matter of law for design-related damages, but if the damage is unrelated to the design (e.g., it results from improper construction or improper maintenance), then the public entity may still be liable [citations]." (*Mozzetti v. City of Brisbane* (1977) 67 Cal.App.3d 565, 573, disapproved on a different point in *Cornette v. Department of Transportation*

14

repeatedly pointed out to the trial court, the pink cement and the stop sign were on adjacent property that was neither owned nor controlled by the City and therefore were not "design" elements *of the City's property* that could be the subjects of a design immunity defense.

The third and fourth sentences of the City's "[d]esign of the [d]riveway" instruction improperly told the jury that it could not "rely on" elements of the driveway, including "the placement of the stop sign, the left turn pocket, and the presence of the pink cement" in deciding whether "a dangerous condition existed." This was legally incorrect, and it directly conflicted with another instruction given to the jury, which told it that the City's "property may be considered dangerous if a condition on adjacent property, such as the pink stamped concrete or the location of the stop sign, exposes those using the public property to a substantial risk of injury in conjunction with the adjacent property." Giving the jury these two conflicting instructions could not have been anything but hopelessly confusing to the jury. Consequently, we must conclude that the trial court erred in giving the "[d]esign of the [d]riveway" instruction.

## C. Instructional Error Was Prejudicial

The City argues that even if the trial court erred in giving the "[d]esign of the [d]riveway" instruction, the error was not prejudicial. "[I]nstructional error requires reversal only '"where it seems probable" that the error "prejudicially affected the verdict."' [Citation.] The reviewing court should consider not only the nature of the error, 'including its natural and probable effect on a party's ability to place his full case before the jury,' but the likelihood of actual prejudice as reflected in the individual trial record, taking into account '(1) the state of the evidence, (2) the effect of other

---

(2001) 26 Cal.4th 63, 74.) In this case, improper maintenance was Guernsey's only theory of dangerous condition liability against the City at trial.

15

instructions, (3) the effect of counsel's arguments, and (4) any indications by the jury itself that it was misled.' " (*Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 983 (*Rutherford*); see also *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 570-571 (*Soule*).)

Guernsey argues that the jury's verdict was "close," that the jury used the "[d]esign of the [d]riveway" instruction in answering the critical questions on the verdict form, questions 2a and 2b, and that the jurors understood the "[d]esign of the [d]riveway" instruction to preclude it from holding the City liable. Guernsey relies in part on juror declarations that she presented to the trial court in support of her new trial motion, and she contends that these juror declarations were admissible evidence. The City claims that the juror declarations were inadmissible under Evidence Code section 1150. The City also contends that neither the juror declarations nor the jury's questions to the court establish that the "[d]esign of the [d]riveway" instruction was prejudicial.

Evidence Code section 1150 provides: "(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. *No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.* [¶] (b) Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict." (Evid. Code, § 1150, italics added.) "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent." (*People v. Hutchinson* (1969) 71 Cal.2d 342, 350.)

The key statements in the juror affidavits upon which Guernsey relies are: (1) the vote on dangerous condition was 9 to 3; (2) a juror changed his vote because he "felt outvoted"; (3) it was the foreperson's handwriting on the "[d]esign of the [d]riveway"

16

instruction; (4) the jury used the instruction to answer questions 2a and 2b; (5) the jury discussed and "agreed" that the instruction did not allow them to find a dangerous condition; and (6) some jurors "stated" that the City was partially responsible.

Nearly all of these statements were inadmissible because they were reflections of the jurors' mental processes. " '[W]hen a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150.' [Citation.]" (*People v. Lewis* (2001) 26 Cal.4th 334, 389 (*Lewis*).) " '[T]he subjective quality of one juror's reasoning is not purged by the fact that another juror heard and remembers the verbalization of that reasoning. To hold otherwise would destroy the rule . . . which clearly prohibits the upsetting of a jury verdict by assailing these subjective mental processes. It would also inhibit and restrict the free exchange of ideas during the jury's deliberations.' " (*Mesecher v. County of San Diego* (1992) 9 Cal.App.4th 1677, 1683-1684.)

The "mental processes" prohibition applies to juror affidavits conveying jurors' statements about their *understanding* of certain words in instructions. (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1125-1126 (*Bell*); see also *People v. Steele* (2002) 27 Cal.4th 1230, 1261; *People v. Dillon* (2009) 174 Cal.App.4th 1367, 1384, fn. 9.) This prohibition also precludes the admission of a statement in a juror affidavit that the polling of the jurors was inconsistent with their actual votes (*Bossi v. State of California* (1981) 119 Cal.App.3d 313, 318) and of statements describing the amount of time that the jury spent discussing an issue (*People v. Davis* (2009) 46 Cal.4th 539, 617).

Guernsey relies on *Harb v. City of Bakersfield* (2015) 233 Cal.App.4th 606 (*Harb*). In *Harb*, the plaintiff claimed that an ambiguous instruction was prejudicial. In support of the plaintiff's motion for a new trial, the plaintiff submitted juror declarations. The trial court struck some statements in the declarations but not others. (*Harb*, at

17

pp. 623-624.)  On appeal, neither party challenged the trial court's rulings on the admissibility of portions of the juror declarations.  (*Harb*, at p. 623.)  The Court of Appeal noted in passing that the trial court had not erred in failing to strike portions of juror affidavits stating that the jury had "discussed" a particular instruction and that jurors had " 'verbally agreed' " that the instruction " 'did not permit us' " to find defendants liable.  (*Harb*, at pp. 623-624.)  Although the *Harb* court quoted *Bell*, it did not explain why these statements were not inadmissible under Evidence Code section 1150's "mental processes" prohibition.  The *Harb* court's dicta on this point is unpersuasive.  " 'The courts have been firm . . . in precluding affidavits which do no more than characterize the affiant's own state of mind [citation] or the state of mind of other members of the jury [citations].' "  (*People v. Romero* (1982) 31 Cal.3d 685, 695.)

While there are situations where the fact that a statement was made by a juror during deliberations may be admissible, the situation before us is not one of them.  "Evidence Code section 1150, subdivision (a) does not prohibit admitting a statement that reflects a juror's reasoning processes *if the statement itself amounts to juror misconduct*, comparable to an objective fact such as reading a novel during trial, or consulting an outside attorney for advice on law relevant to the case."  (*Lewis*, *supra*, 26 Cal.4th at p. 389, italics added.)  The juror declarations in this case were not aimed at showing juror misconduct; they were addressed to the impact of the "[d]esign of the [d]riveway" instruction on the jury's verdict.  In this situation, the fact that a juror made a statement during deliberations has no probative value for any purpose other than to reveal the mental processes of that juror and other jurors.

None of the information in the juror declarations that Guernsey now relies upon was admissible under Evidence Code section 1150 with the possible exception of the foreperson's declaration that the notations on the "[d]esign of the [d]riveway" instruction

18

had been placed there by him.[7]  Nevertheless, even without the foreperson's declaration, it was undisputed that the jury's copy of the "[d]esign of the [d]riveway" instruction bore handwritten notations.  A line had been drawn between the third and fourth sentences of the instructions.  "2.a." had been written next to the third sentence, and "2.b." had been written next to the fourth sentence.

The third and fourth sentences of the "[d]esign of the [d]riveway" instruction read: "To find that the Driveway presented a dangerous condition, you cannot rely on characteristics of the Driveway itself (e.g., the placement of the stop sign, the left turn pocket, and the presence of the pink cement).  Although you can consider those elements of the Driveway when weighing whether or not the faded crosswalk lines and bushes created a dangerous condition, you cannot rely on those design elements of the intersection to find that a dangerous condition existed."  The verdict form's question "2a" asked:  "Was the property in a dangerous condition at the time of the incident because of the lack of crosswalk lines and/or bushes on the City's property?  [¶]  ___ Yes ___ No."  The verdict form's question "2b" asked:  "Was the property in a dangerous condition at the time of the incident because of lack of crosswalk lines and/or bushes in conjunction with one or more conditions on adjacent property?  [¶]  ___ Yes ___ No  [¶]  If yes, check one or both:  [¶]  ___ Pink concrete  [¶]  ___  Location of stop sign."  The jury answered both questions "No."

The fact that the "[d]esign of the [d]riveway" instruction given to the jury bore notations associating the verdict form's questions with the erroneous instruction demonstrates that the jury's verdict was influenced by the erroneous instruction.  The only reasonable inference that could be drawn was that some member of the jury had

---

[7]  The foreperson of the jury, Christopher Chopyk, submitted a declaration in which he stated that he had written "2.a." and "2.b." on the jury's copy of that instruction.

19

drawn the line on the instruction between the third and fourth sentences of the instruction and written "2.a." next to the third sentence and "2.b." next to the fourth sentence.

The handwriting on the instruction by a member of the jury strongly supports a conclusion that the jury used the third sentence of the "[d]esign of the [d]riveway" instruction to answer question 2a on the verdict form and the fourth sentence of that instruction to answer question 2b on the verdict form. Since these two sentences of the instruction were erroneous, and questions 2a and 2b were the critical questions regarding whether the City's property was in a dangerous condition, it "seems probable" that the "[d]esign of the [d]riveway" instruction "'"prejudicially affected the verdict."'" (*Rutherford*, *supra*, 16 Cal.4th at p. 983.)

The handwriting on the "[d]esign of the [d]riveway" instruction was not the only evidence of prejudice. The "[d]esign of the [d]riveway" instruction conflicted with the "adjacent property" instruction, which otherwise could have provided substantial support for a finding that the City's property was in a dangerous condition. The jury submitted multiple questions to the court about the meaning of "dangerous condition," which suggested that it was struggling with this issue. And there was significant evidence that the City's property was in a dangerous condition since it was undisputed that the crosswalk was badly faded and had been poorly maintained. Under these circumstances, we find that the trial court prejudicially erred in giving the "[d]esign of the [d]riveway" instruction, and reversal is required.[8] (*Soule*, *supra*, 8 Cal.4th at pp. 570-571.)

---

[8] Since we reverse and remand for a new trial, it is unnecessary for us to address Guernsey's other assertions of instructional error, her claim that the verdict form was prejudicially erroneous, or her challenge to the court's award of expert witness fees.

## IV. Disposition

The judgment is reversed as to the City. Guernsey shall recover her appellate costs.

_____
Mihara, J.

WE CONCUR:




_____
Premo, Acting P. J.




_____
Bamattre-Manoukian, J.




Guernsey v. City of Salinas
H043283

22

| | |
|---|---|
| Trial Court: | Monterey County Superior Court |
| Trial Judge: | Honorable Lydia Villarreal |
| Attorneys for Plaintiffs and Appellants: | Valerie T. McGinty<br>Law Office of Valerie T. McGinty |
| | Daniel U. Smith<br>Law Office of Daniel U. Smith |
| | Mary E. Alexander<br>Jennifer L. Fiore<br>Mary Alexander & Associates, P.C. |
| Attorneys for Defendants and Respondents: | Christopher A. Callihan<br>Office of the City Attorney |
| | Vincent P. Hurley<br>Rachel Ostrander<br>Law Offices of Vincent P. Hurley |
| | Sabrina Heron Strong<br>Laura Perry Uyeno<br>Jefferson J. Harwell<br>O'Melveny & Myers LLP |

Guernsey v. City of Salinas
H043283