Filed 6/26/26  Lord v. Bell Sports CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| JOHN SIDNEY DAVENPORT LORD,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>BELL SPORTS INC.,<br><br>    Defendant and Respondent. | H052707<br>(Santa Cruz County<br>Super. Ct. No. 19CV03591) |

On January 12, 2018, appellant John Sidney Davenport Lord sustained serious injuries, including traumatic brain injuries, after the bicycle he was riding fell sideways. There were no witnesses, and details concerning the accident remain unknown.  At the time, Lord was wearing a bicycle helmet manufactured by Bell Sports Inc. (Bell).  Lord brought this products liability action against Bell, claiming that the helmet was defectively designed and that the defect contributed to his injuries.  The jury returned a verdict in favor of Bell.

The trial court entered judgment on the verdict on August 9, 2024.   Thereafter, Lord filed a motion for new trial pursuant to section 657 of the Code of Civil Procedure,[1] and a motion for judgment notwithstanding the verdict (JNOV) pursuant to section 629, subdivision (a).  The court denied both motions, and Lord's appeal followed.

---

[1] All further statutory references are to the Code of Civil Procedure unless otherwise stated.

The sole issue on appeal concerns the trial court's response to a question posed by the jury during its deliberations. The jury asked for clarification about a question ("Question 3") contained in the special verdict form. Question 3 of the form read in part: "Did the benefits of the helmet's design outweigh the risks of the design?" The instructions for the verdict form were that if the jury answered Question 3, "Yes," it should sign and return the form without addressing Bell's potential liability for Lord's injuries and damages. The jury's query to the court during deliberations read in part: "[W]hat should a juror do if they feel the answer to question number 3 [of the verdict form] is yes, but Bell still has some liability? As the answer form is written, that is not possible."

The trial court heard argument from counsel concerning the appropriate response to the jury's question. Lord's counsel argued that because the jury's query indicated confusion about the risk-benefit test in a strict liability case, the court should reread the jury instruction concerning this test, namely, Judicial Council's California Civil Jury Instruction (CACI) No. 1204. Bell's counsel opposed this approach, and the court rejected it. Instead, the court responded to the jury by, inter alia, (1) rereading the instruction that provided guidance in completing the verdict form, and (2) indicating to the jury that it could review other jury instructions for guidance in answering the questions on the verdict form.

Lord contends the trial court committed error by failing to respond directly to the jury's query by rereading the relevant instruction about the risk-benefit test, CACI No. 1204. He argues that this error was prejudicial in that, given the jury's inclination stated in its question to find liability, there was a reasonable probability that but for the court's error, he would have received a favorable jury verdict.

We conclude that there was no error, and we will affirm the judgment.

# I. FACTUAL BACKGROUND

## A. Factual Summary

### 1. *The Accident*

After a career in the navy, Lord began working as a commercial pilot in 1995. He remained in that occupation until his accident in January 2018.

Lord testified that he began riding bicycles when he was eight years old. He rode more frequently when he was in his early 20's and used cycling as his main form of exercise in his 30's. From his early 20s forward, he always wore a protective helmet while riding a bicycle. Lord testified that he always wore his helmet correctly: "Level with the head, ear level, with the chin strap buckled, and the adjustment in the back secured." His custom was to check to make sure the helmet was secured properly by determining he could not fit too many fingers under the strap. Lord said he "would not feel safe" wearing a bicycle helmet loosely, as Bell contended occurred at the time of the accident.

Lord recalled nothing from the day of the accident on January 12, 2018. The two eyewitnesses who testified, a retired married couple, did not witness the accident; rather, they had been walking in the area and first observed Lord lying prone on his left side next to his bicycle. They observed that Lord's feet were still attached to the pedals of the bicycle.

The two eyewitnesses testified that Lord was wearing a helmet while lying on the ground, and that it appeared to have been "in proper position" and not tilted or rotated on his head. A fireman/paramedic who treated Lord at the scene testified that Lord was wearing a helmet and that it was in a proper position, not "tilted or rotated in any way." When Lord's helmet was removed by paramedics at the scene, its chinstrap was not loose.

### 2. *Lord's Injuries*

Lord sustained extensive injuries in what the defense medical expert described as "a violent accident" in which he "fractured a number of structures … [and sustained] some very significant soft tissue injuries on the left side of his body overlying the left hip." He

suffered eight left-sided fractures to his ribs, a partially collapsed left lung, and a fractured left iliac wing of his pelvis.

The most serious injuries were to Lord's head. He sustained a comminuted (multiple-part) skull fracture on the "higher part" of his left temporal bone, close to where the parietal bone begins higher up in the skull.[2] Associated with the skull fracture was "a large left epidural hematoma which was causing pressure on the brain which caused … the midline of his brain … being shifted to the other side." Lord's neurosurgeon described it as "a left-sided big epidural hematoma that involved the frontal parietal and temporal lobes." The source of the bleeding was the middle meningeal artery; the artery starts from behind the eye socket and has multiple branches that feed the brain. Additionally, Lord had a "macerated, dirty cut" on the left side of his scalp.

An emergency craniotomy was performed on Lord by Dr. Al Shamy on the day of the accident to address his head injuries. This surgery included cauterizing all active internal bleeding, removing blood clots, repairing the skull fracture

Lord was in a coma for approximately one month. After his discharge from the intensive care unit of a hospital in Houston, Lord was transferred to an inpatient rehabilitation facility for ongoing physical, occupational, and speech therapy. He was discharged from the rehabilitation facility in late April 2018.

Upon discharge from the rehabilitation facility, Lord—according to the testimony of Lord's neurosurgeon expert, Dr. Aroun Amar—remained with "many, many different impairments that [were] really the result of his brain injury"; Dr. Amar characterized them as "severe." The residual impairments included problems with memory, attention span, visual processing, and alexia (inability to read). Lord testified that his residual injuries

---

[2] The temporal bone is the thinnest bone in the skull and is thus more susceptible to fractures. Although Lord's treating neurosurgeon, Dr. George Al Shamy, did not have a specific recollection of the operation, he testified that it was probably true that the fracture of the temporal bone extended upward in the skull to a fracture of the parietal bone.

include balance issues, loss of hearing in his right ear, vision impairment in his right eye, cognitive difficulties, and limitations on his ability to communicate.

### 3. *Bicycle Helmet Evidence*

James Green, Lord's forensic engineering expert—who testified to having 47 years of experience as a forensic engineer reconstructing bicycle accidents that included helmet impact issues—testified that Lord sustained his injuries by falling from his bicycle onto his left side with impact to the left side of his helmeted head. Side falls from bicycles represent the majority in accidents not involving motor vehicles. It is a type of fall for which a bicycle helmet is designed to provide protection.

Green testified that the two components of a bicycle helmet are the interior expanded polystyrene or foam liner (EPS) and the outer hard shell. The outer shell helps keep the EPS together if there is impact. The smooth outer shell reduces the coefficient of friction so that upon impact with the ground, the helmet slides on the pavement. The EPS, by contrast, will "stick to the asphalt." The shell also helps to dissipate the force of the impact to the head.

Green explained that the helmet worn by Lord was comprised of these two components. However, the shell ended at the lower portion of the helmet (below the Bell logo) and the exposed EPS continued downward. Green opined that the point of impact when Lord fell was in the lower, EPS-only portion of the helmet; in that area, the EPS had broken off upon impact. Green performed drop testing with an exemplar helmet comparing results where the respective points of helmet impact were above where the shell started and below the shell where there was only EPS. He concluded that the EPS-only area provided little protection compared with the area covered by the hard shell. Green testified that the measurable force found from the tested drop in the EPS-only area of the helmet "puts too much force of impact on the head." Green opined further that the area of Lord's helmet that failed could, and should, have been covered with a hard shell. In addition, the hard shell should have extended downward on the helmet to provide adequate protection to the user in the event of a side fall. This would have been the "safer alternative." He also testified that

5

there were other helmets available at the time, including one manufactured by Bell, that were designed with the hard shell covering in the EPS-only location of Lord's helmet.

Lord's expert, Dr. Amar, similarly testified that Lord's was a "lower-velocity" side fall accident. He opined that, based upon his experience, the type of severe traumatic brain injury that Lord sustained was uncommon to a person wearing a helmet who had fallen sideways off a bicycle. Dr. Amar noted that a large section of EPS was missing from the left side of Lord's helmet, and this portion of detached foam had covered "the regions of the skull that [were] directly impacted and contributed to the skull fracture." Dr. Amar opined that "the impact was to the helmeted skull, and … that produced the skull fracture because the helmet failed to protect his head in that region."

Bell's mechanism of injury expert, Dr. Elizabeth Raphael, testified that Lord sustained injuries to the left side of his body, including his head. Her opinion was founded upon the theory that Lord had not properly used his bicycle helmet. Dr. Raphael opined that Lord experienced "a single impact to his helmeted head. That impact was partially on his head and partially on the helmet, so that means that a portion of his head directly impacted the pavement." Dr. Raphel explained her opinion: "The actual retention system on Mr. Lord's helmet was not properly adjusted for his head. And because of that, his helmet was able to displace on his head at the time of impact. [¶] Had the helmet and the retention system been properly adjusted to his head so that the helmet stayed on his head, the helmet would have attenuated the forces of the impact, and he would not have sustained the skull fracture, the middle meningeal artery branch lacerations, or the epidural hematoma resulting in the brain injury. And the helmet fracture did not cause or contribute to his brain injuries."[3]

---

[3] Green expressed disagreement with Bell's theory that Lord's head injuries were caused by failing to secure his helmet properly, resulting in the helmet, immediately before the fall, rotating and causing exposure to the left side of his head. Green testified he had never seen this occur in his 47 years as an engineer reconstructing bicycle accidents. Green

Bell's engineering expert, Dave Thom—concurring with Dr. Raphael—testified that there was a single impact to Lord's head and that this included a direct impact of his head to the pavement because the helmet shifted prior to impact. This shifting, Thom opined, was due to Lord having not properly secured the helmet, which Thom described as a "loose retention system."[4]

## II. PROCEDURAL BACKGROUND

On December 2, 2019, Lord filed a complaint against Bell, which he later amended. In the first amended complaint (complaint), Lord alleged four causes of action, negligence, two claims for strict products liability (design defect and failure to warn), and breach of implied warranty. Lord alleged that on January 12, 2018, he was involved in a collision that caused him to fall over while riding his bicycle. He sustained "serious and life-altering injuries" resulting from the Bell Ukon FS Helmet he had purchased having failed to protect his head from such injuries. Lord alleged further that the helmet was defective in that it "was designed to leave a significant amount of expanded polystyrene ('EPS') exposed from the molded polycarbonate shell. Without the protection of the shell, the EPS became brittle during the collision and broke instead of protecting Plaintiff LORD's head. Defendant Bell's design should have reinforced the EPS with the molded shell, allowing the EPS to remain strong and able to protect Plaintiff from serious injury."

Bell answered the complaint.

The case proceeded to jury trial that commenced on April 15, 2024. Before verdict, Lord withdrew three of his claims; the case was submitted to the jury on Lord's claim for

performed a test and concluded that, even with the chin strap cut off, this scenario was impossible to create.

[4] On cross-examination, Thom acknowledged that assuming Lord had worn the helmet properly—which Thom opined was not the case—then it would be proper to conclude that his helmet did not do what it was designed to accomplish, namely, to provide "limited protection" to portions of the head it covered. During the rebuttal phase of the trial, Lord again emphasized that he had secured the helmet properly on the day of the accident, and that defense depictions to the contrary were incorrect and "degrading" and "a mockery."

7

strict liability—design defect.  A verdict was rendered in favor of Bell on May 22, 2024.  The jury answered "No" to the first question of the special verdict form reading:  "Was the helmet misused after it left Bell's possession in a way that was so highly extraordinary that it was not reasonably foreseeable to Bell?"  But after answering this question in a manner favorable to Lord—and after skipping the second question as instructed—the jury answered "Yes" to Question 3, which read:  "Did the benefits of the helmet's design outweigh the risks of the design?"  Pursuant to the instructions in the verdict form, the jury skipped the remaining questions concerning liability and damages and signed and returned the form.  A judgment on the special verdict was filed on August 9, 2024.

Lord filed alternative motions for JNOV or for new trial, which included declarations from two of the jurors.  (These declarations are discussed in detail, *post*.)  Bell opposed the motions, including the filing of a separate pleading objecting to the two juror declarations.  The court denied Lord's alternative motions for JNOV/new trial on October 25, 2024.  Lord filed a notice of appeal from the judgment on November 13, 2024.[5]

---

[5] Lord states in his notice of appeal that it is from the judgment entered August 8 [sic], 2024.  The appeal notice contains no reference to the order denying the alternative JNOV/new trial motions.  An order denying new trial is not directly appealable but may considered in an appeal from the underlying judgment.  (*Walker v. Los Angeles County Metropolitan Transportation Authority* (2005) 35 Cal.4th 15, 18.)  In contrast, an order denying a JNOV motion is directly appealable.  (§ 904.1, subd. (a)(4); see *Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 (*Sweatman*).)  Therefore, to the extent that the postjudgment order of October 25, 2024, denied Lord's JNOV motion, he should have expressly designated the order in his subsequent notice of appeal.  (See *Sweatman, supra,* at p. 68.)  Since Lord's notice of appeal does not reference the order denying the JNOV motion and he submits no argument challenging that ruling, we will not address the order denying the JNOV motion.

## III.    DISCUSSION

### A.    Claim of Error in Responding to Jury Question

#### 1.    *Products Liability:  The Risk-Benefit Test*

To establish a design defect in a products liability case, two alternative tests may be utilized.  "First, a product may be found defective in design if the plaintiff establishes that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.  Second, a product may alternatively be found defective in design if the plaintiff demonstrates that the product's design proximately caused his injury and the defendant fails to establish, in light of the relevant factors, that, on balance, the benefits of the challenged design outweigh the risk of danger inherent in such design."  (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432 (*Barker*).)  "Whether the jury should be instructed on either the consumer expectations test or the risk/benefit test depends upon the particular facts of the case.  [Citation.]"  (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1233.)  We are concerned here with the second test.

The California Supreme Court has explained the risk-benefit test as follows:  "[A] product may be found defective in design, even if it satisfies ordinary consumer expectations, if through hindsight the jury determines that the product's design embodies 'excessive preventable danger,' or, in other words, if the jury finds that the risk of danger inherent in the challenged design outweighs the benefits of such design.  [Citations.]"  (*Barker*, *supra*, 20 Cal.3d at p. 430, fn. omitted.)  In assessing the adequacy of the product's design under this test, "a jury may consider, among other relevant factors, the gravity of the danger posed by the challenged design, the likelihood that such danger would occur, the mechanical feasibility of a safer alternative design, the financial cost of an improved design, and the adverse consequences to the product and to the consumer that would result from an alternative design."  (*Id.* at p. 431; see also *Chavez v. Glock, Inc.* (2012) 207 Cal.App.4th 1283, 1308.)

9

Under the risk-benefit test, if the plaintiff makes a prima facie showing that he or she was injured as a proximate result of the design of the product, the manufacturer then bears the burden to prove "that the utility of the challenged design outweighs its dangers. [Citation.] … [P]lacement of the risk-benefit burden on the manufacturer is appropriate because the considerations which influenced the design of its product are 'peculiarly within … [its] knowledge.' [Citation.] Furthermore, … 'fundamental policies' … dictate that a manufacturer who seeks to escape design defect liability on risk-benefit grounds 'should bear the burden of persuading the trier of fact that its product should not be judged defective. …' [Citation.]" (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 571, fn. 8 (*Soule*), quoting *Barker*, *supra*, 20 Cal.3d at pp. 431–432.) As the Supreme Court has explained further, "*Barker* allows the evaluation of competing designs, but it does not require proof that the challenged design is the safest possible alternative. The manufacturer need only show that given the inherent complexities of design, the benefits of its chosen design outweigh the dangers." (*Soule*, *supra*, at p. 571, fn. 8.)

### 2. *Background*

As discussed in greater detail below, Lord contends that the trial court, in response to a question by the jury, should have reread the instruction based on CACI No. 1204, which explained the risk-benefit test. That instruction, as read by the trial court, provided that if Lord established that he was injured and that the design of the Bell helmet was a substantial factor in causing that injury, then the jury should find for Lord, "unless Bell proves the benefits of the helmet's design outweigh the risks of the design," based upon consideration of five specific factors "and other relevant factors."[6]

---

[6] During closing argument, Lord's counsel specifically addressed the risk-benefit test, indicating: "If we prove that [Lord wore the helmet properly], then your decision has to be for Mr. Lord unless … Bell, can prove to you that the benefits of the bicycle helmet's design outweigh [its] risks. [¶] Bell needs to come and tell you, here is why we didn't put shell there. That is Bell's burden. And they have given you nothing." The entire instruction (CACI No. 1204)—tracking the risk-benefit factors enunciated in *Barker*, *supra*, 20 Cal.3d at pages 431 to 432—read by the court stated: "Mr. Lord claims that the bicycle helmet's

10

The record shows there was no disagreement between the parties that the jury should be given a risk-benefit instruction based on CACI No. 1204. During a conference with counsel, the court noted that the parties had agreed that CACI No. 1204 would be read to the jury, but that the parties had submitted their own versions of the precise instruction. The court read to the jury the version of CACI No. 1204 that had been proposed by Lord's counsel. And because it felt it had misspoken in the first reading, the trial court read CACI No. 1204 to the jury a second time.

The trial court provided the jury with a copy of all instructions for its deliberations. As part of its instructions, the trial court advised the jury that if the "jurors … need[ed] further explanation about the laws that apply to the case," any questions should be submitted in writing to the court; after conferring with counsel, the court would then do its best to answer the questions.

During the third day of deliberations, the jury submitted a query which read in full as follows: "Question for the Judge. In regard[] to the jury answer form, what should a juror do if they feel the answer to question number 3 is yes, but Bell still has some liability? As the answer form is written, that is not possible." The trial court indicated to counsel that its planned response was to reread CACI No. 5012 (i.e., introduction to special verdict form), and read a caselaw annotation from that instruction stating that for a 12-person jury, it is sufficient if any nine jurors agree to each question on the special verdict form. The court

---

design caused harm to him. [¶] To establish this claim, Mr. Lord must prove all of the following:· One, that he was harmed; and, two, that the bike helmet's design was a substantial factor in causing harm to him. [¶] If Mr. Lord has proved these facts, then your decision on the claim must be for Mr. Lord unless Bell proves the benefits of the helmet's design outweigh the risks of the design. [¶] In deciding whether the benefits outweigh the risks, you should consider the following: A, the gravity of potential harm resulting from the risk of the bicycle helmet; B, the likelihood that this harm would occur; C, the feasibility of an alternate design at the time of the manufacture; D, the cost of an alternative design; E, the disadvantages of an alternative design, and other relevant factors."

11

indicated it also intended to give each juror a copy of the special verdict form for the juror's own use.

Lord's counsel requested that the court reread to the jury the risk-benefit instruction because it was the source of Question 3 of the verdict form. Counsel argued that the jury, from its query, might have "some confusion about liability with regard to the risk-benefit test" and it would not "hurt" if the risk-benefit instruction were reread to the jury. Lord's counsel reiterated that the jury's query demonstrated it did not understand the risk-benefit test and that it would be appropriate to "instruct [the jury] where the law could be found so that [it could] answer [the jury form] properly."

Bell's counsel disagreed, arguing that it would be improper for the court to reread the risk-benefit instruction to the jury. He asserted that, in its query, the jury did not ask for an explanation of Question 3 on the verdict form, and it did not express any confusion about that question. Bell's counsel argued further that "it would be inappropriate … to read [the jury] an instruction [it was] not asking for. … [T]here is no indication [the jury does not] understand the risk-benefit test."

After considering both arguments, the trial court ruled that it would proceed as it initially proposed. But the court indicated it would also advise the jury that it could consult the other jury instructions in answering any question on the verdict form. The court then instructed the jury in response to its query by: (1) rereading CACI No. 5012 that provides an explanation of the procedure the jury should follow in completing the verdict form; (2) advising the jury that there is caselaw holding that "[w]hen a jury is composed of 12 persons, it is sufficient if any nine jurors arrive at each [special] verdict regardless of the juror's votes on other special verdict questions"; (3) indicating the court would provide each juror with a copy of the verdict form for his or her personal use, but that the court would

ultimately read only the foreperson's verdict form; and (4) stating that in answering each question on the verdict form, the jury could consult other instructions for guidance.[7]

### 3.    Standard of Review

As discussed, *post*, Lord argues that the trial court was required to respond to the jury's inquiry about "[a] point of law arising in the cause" (§ 614) by rereading CACI No. 1204.  He asserts the court's error in failing to so respond to the jury's inquiry should be reviewed de novo, citing authority applying this standard to review for instructional error.  (See, e.g., *People v. Manriquez* (2005) 37 Cal.4th 547, 584 [independent review of claim of error in failing to give instruction on the lesser included offense of voluntary manslaughter in capital murder case].)

We disagree.  This is not an instructional error case.  A claim that the trial court erred in its actions taken in response to jury's inquiry during deliberations is reviewed for abuse of discretion.  (See *People v. Eid* (2010) 187 Cal.App.4th 859, 882 (*Eid*).)[8]

---

[7] The parties agreed to the trial court's inclusion of CACI No. 5012 as part of the instructions.  As reread by the court to the jury, CACI No. 5012 provides:  "I will give you a verdict form with questions you must answer.  I have already instructed you on the law that you are to use in answering these questions.  You must follow my instructions and the forms carefully.  You must consider each question separately.  Although you may discuss the evidence and the issues to be decided in any order, you must answer the questions on the verdict forms in the order they appear.  After you answer a question, the forms tell you what to do next.  [¶] At least [nine] of you must agree on an answer before you can move on to the next question.  However, the same [nine] or more people do not have to agree on each answer.  [¶] All 12 of you must deliberate on and answer each question regardless of how you voted on any earlier question.  Unless the verdict form tells all 12 jurors to stop and answer no further questions, every juror must deliberate and vote on all of the remaining questions.  [¶] When you have finished filling out all of the forms, your presiding juror must write the date and sign it at the bottom of each form of the last page and then notify the bailiff that you are ready to present your verdict in the courtroom."

[8] *Eid* concerned the trial court's response to a jury's request for information about a point of law under Penal Code section 1138.  While we are unaware of any published authority addressing the standard for reviewing a claim that the trial court erred under (Code of Civil Procedure) section 614, the language of the two statutes are, in all material respects, nearly identical.  Therefore, we perceive of no reason why the abuse of discretion standard

#### 4. *Discussion—Response to Jury's Inquiry*

Lord argues on appeal that, in response to the jury's inquiry, the "court failed to act to clarify the law for the jury, even in the face of its expressed confusion and the express request of Lord's counsel." He contends that from its query, the jury expressed "confusion [that] manifestly arose from … an inability to understand how the risk[-]benefit test applied." Lord argues, therefore, that because the jury "was manifestly confused about how to apply the risk-benefit test" and "sought guidance from the trial court," its failure to provide such guidance constituted reversible error.[9]

The foundation of Lord's argument is that through its query about Question 3 of the verdict form, the jury expressed that it was confused about how it should apply the risk-benefit test in this case. Because of that confusion, Lord contends, it was incumbent upon the trial court to give further instructions concerning the test by rereading CACI No. 1204. This analysis is flawed because its central tenet does not withstand scrutiny.

Referring to the verdict form, the jury asked the court, "[W]hat should a juror do if they feel the answer to question number 3 is yes, but Bell still has some liability? As the answer form is written, that is not possible." The jury's query did not express that it was confused about the instruction explaining the risk-benefit test, CACI No. 1204. The jury did not state that it found this, or any other instruction, hard to follow. From its query, the jury did not ask the court to reread or explain CACI No. 1204. And—without mentioning that instruction specifically—the jury did not ask the court to clarify or explain the law

---

would not apply to civil proceedings governed by section 614, as well as in criminal proceedings under Penal Code section 1138.

[9] Lord also argues at some length "that the typical formulations of the … risk-benefit test … are difficult to comprehend and confusing to jurors." But Lord agreed to the court's giving the risk-benefit instruction and it was his version of CACI No. 1204 that was read by the court. Further, Lord did not argue below that the risk-benefit test was confusing, nor did he propose any language to address any specific, supposedly confusing aspects of the instruction. (Cf. *Weirum v. RKO General, Inc.* (1975) 15 Cal.3d 40, 50 ["party cannot attack the substance of an instruction if he himself proposed similar instructions"].)

14

concerning the risk-benefit test. At most, the jury's question might be construed as an expression of some uncertainty about how to complete the special verdict form. Any such uncertainty would implicate a *different* instruction, CACI No. 5012, which explained the process the jury was required to follow when it answered the verdict form. The trial court specifically addressed this issue by rereading for the jury CACI No. 5012 and by reading a caselaw annotation from that instruction.[10]

Lord contends that because of the jury's "implicitly expressed confusion about the risk-benefit test," "the trial court should have, at the very least, redirected the jury's attention specifically to CACI 1204. …"[11] Lord cites section 614 and several cases which he contends required the trial court to provide this guidance concerning the law to the jury.

Section 614 provides that the trial court shall give information—portions of testimony or explanation of an issue of law—that the jury, during its deliberations, indicates that it requires.[12] The statute provides that if the jury "desire[s] to be informed of any point of law arising in the cause," "the information required must be given." (§ 614.) "The requirements of [§ 614], phrased in mandatory language, must be strictly complied with.

---

[10] We have addressed Lord's claim that the trial court erred by failing to reread CACI No. 1204 to address the jury's purported confusion about the risk-benefit test without giving consideration to the two juror declarations submitted by Lord in support of his new trial motion. As we conclude (see pt. II.B., *post*), the juror declarations—as the trial court correctly held—were inadmissible.

[11] On several occasions in his opening brief, he argues or suggests that the trial court should have done *more than* reread for the jury CACI No. 1204, such as utilize caselaw to provide additional explanation of the risk-benefit test. Lord's claim is without merit. Aside from the fact that the jury did not express confusion about the test or request any clarification about it, Lord's counsel *did not ask* the trial court to do anything more than reread CACI No. 1204 to the jury.

[12] Section 614 reads: "After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed of any point of law arising in the cause, they may require the officer to conduct them into court. Upon their being brought into court, the information required must be given in the presence of, or after notice to, the parties or counsel."

[Citation.]" (*Asplund v. Driskell* (1964) 225 Cal.App.2d 705, 712.) As has been explained: "Trial courts are duty bound to give supplemental instructions if additional guidance is necessary to give the jury ' "a full and complete understanding of the law applicable to the facts" ' [citations, including § 614], but those supplemental instructions—like all jury instructions—must correctly convey the law [citations]." (*Flores v. Liu* (2021) 60 Cal.App.5th 278, 289.)

We conclude that section 614 offers no support for Lord's position that the trial court erred. The court's duty to provide the jury with "the information required" is triggered by the jury's indication during deliberations that it "desire[s] to be informed of any point of law." (*Ibid.*) Here, as discussed, the jury in its question did not state a wish that it be informed further on a point of law relating to either the benefit-risk test or to the instruction (CACI No. 1204) describing that test. Further, even if the jury's query could be properly construed as a desire to be informed on the law concerning the risk-benefit test—which construction, we have concluded, would not be a reasonable one—the trial court *did* inform the jury about the test by advising it that it could consider the instructions previously given (which included CACI No. 1204) in answering the questions in the verdict form. (See *People v. Beardslee* (1991) 53 Cal.3d 68, 97 [although "court has a primary duty to help the jury understand the legal principles it is asked to apply. … [, t]his does not mean the court must always elaborate on the standard instructions"].)

Lord cites *Kumelauskas v. Cozzi* (1961) 191 Cal.App.2d 572 (*Kumelauskas*) to support his position that the trial court should have reread CACI No. 1204. He states that under that authority, "the mere rereading of instructions previously given, upon [the] jury's request for explanation, is not error." *Kumelauskas* does not support Lord's claim of error. In that case, the appellate court rejected appellant's claim that the trial court had erred by

16

rereading an instruction concerning a particular statute about which "[t]he jury [had] requested further advice." (*Kumelauskas, supra,* at p. 575.)  Here, however, there was no request by the jury to reread CACI No. 1204.  We conclude therefore that the trial court did not abuse its discretion by refusing Lord's request to reread that instruction.[13]

Additionally, Lord relies on *Davis v. Erickson* (1960) 53 Cal.2d 860.  In *Davis*, during deliberations, the jury asked the court to reread instructions concerning negligence and assumption of the risk; the jury later expanded that request to include rereading all instructions pertaining to negligence.  (*Id.* at pp. 861–862.)  The trial court inadvertently omitted three instructions on negligence and proximate cause, but when the appellant called the issue to the court's attention, it refused to reread the three omitted instructions.  (*Id.* at p. 862.)  The problem was compounded when the trial court, after rereading the instructions (except the three omitted ones), specifically told the jury it had " 'read all the instructions pertaining to negligence and … pertaining to the doctrine of assumption of risk,' " and it then asked whether the jury needed the rereading of any other instructions reread.  (*Id.* at p. 862)  The jury returned a verdict for the defense.  (*Id.* at p. 861.)  The Supreme Court reversed, concluding that "[t]he omission of [one of the three] instruction[s] … in the rereading to the jury struck at the heart of appellant's case" and constituted prejudicial error.

---

[13] Similarly, Lord's reliance on *Ramona Manor Convalescent Hospital v. Care Enterprises* (1986) 177 Cal.App.3d 1120 is misplaced.  There, the trial court reread or provided copies of three instructions to address the jury's query during deliberations about the word " 'intentionally' " in the context of a special verdict question asking if the defendant had intentionally interfered with the plaintiff's contractual relations.  (*Id.* at p. 1136.)  The court in *Ramona Manor* held that this response to the jury's inquiry was appropriate:  "It is, of course, settled in California that no error arises from a court's choice to reread instructions in response to jury requests for further information, so long as the original instructions themselves do not constitute incorrect statements of law.  [Citation.]" (*Id.* at pp. 1136–1137, citing *Kumelauskas*, *supra*, 191 Cal.App.2d at p. 575.)  Here, there was no request by the jury for further information about the risk-benefit test that would have warranted the trial court's rereading of CACI No. 1204.

(*Id.* at pp. 862–863.)  *Davis* is distinguishable.  Its facts—including the existence of a specific jury request to reread the applicable instructions, the court's unintentional omission of three instructions that should have been included in the rereading, and the court's refusal to rectify that omission—bear little resemblance to the present case.

Lastly, Lord relies extensively on *Bartosh v. Banning* (1967) 251 Cal.App.2d 378 (*Bartosh*).  In that case, the plaintiff, a bystander, was injured during a barfight between two patrons, and she sued the two participants and the bar.  (*Id.* at pp. 381–383.)  A key issue was whether one of the participants in the fight (Banning), who was sued for negligence and claimed self-defense, had acted with reasonable care to avoid the bystander's injury.  (*Id.* at p. 385.)  Although the court instructed the jury on negligence issues, including Banning's bearing the burden of proving he acted in self-defense and in establishing the plaintiff's contributory negligence, it did not give an instruction on Banning's duty of care to avoid the plaintiff's becoming injured during the fight.  (*Id.* at p. 386.)  After brief deliberations, the jury returned with two questions:  " 'One, is proof of negligence determined only by proof of who started the fight?  Two, if not, by prudent action he could avoid the fight and did not, was he negligent?' "  (*Id.* at p. 387.)  The trial court refused to provide further instruction to the jury.  (*Ibid.*)

The appellate court reversed.  Inferring from the jury's questions that "the jury [had been] left in a state of confusion as to the law applicable to the rights and duties of Banning" (*Bartosh*, *supra*, 251 Cal.App.2d at p. 386), the appellate court concluded the trial court, under the circumstances, had failed to perform its duty to further instruct the jury to address its questions (*id.* at p. 387).  The *Bartosh* court reasoned:  "Where the trial court has given instructions which are inadequate, or are so scanty as to leave the jury without a full understanding of the law applicable to the case, and this lack of understanding is brought to

the attention of the court by the jury's request for further guidance, it … was … incumbent on the trial court to give instructions on all the vital issues in the case so that the jury would have a full and complete understanding of the law applicable to the facts.' [Citation.] 'The responsibility for adequate instruction becomes particularly acute when the jury asks specific guidance.' [Citation.]" (*Ibid.*)

*Bartosh* is distinguishable. Here, there is no indication that "the trial court ha[d] given instructions which [were] inadequate, or [were] so scanty as to leave the jury without a full understanding of the law applicable to the case." (*Bartosh*, *supra*, 251 Cal.App.2d at p. 387.) Unlike *Bartosh*, the court did not omit rereading a significant instruction that had been requested by the jury. Thus, although the court has a duty to instruct the jury on " 'all the vital issues in the case' " (*ibid.*), there is no indication here that the trial court failed to satisfy that obligation. It is undisputed that the trial court properly instructed on the risk-benefit test. Indeed, unlike in *Bartosh*, Lord makes no claim that additional instruction was necessary, only that the trial court should have reread an adequate instruction previously given. Nor was it irrational for the trial court to have understood the jury note as requesting specific guidance only on how to complete the verdict form and not on a particular point of law. Lord explains neither how *Bartosh* could support reversal without a request for instruction on the law, nor how the rereading of CACI No. 1204 would have addressed the jury's purported confusion about that instruction he contends was evidenced by its note. *Bartosh* therefore offers no support for Lord's claim of error.[14]

---

[14] Lord asserts that *Bartosh* offers support for his position that "[t]he trial court should have sought more information from the jury by questioning the foreperson to determine what the problem was and should have provided the guidance the jury requested." This position was not raised by Lord at the time the trial court was required to address the jury's inquiry. His counsel did not suggest that the court should ask the foreperson questions about the jury's query. Counsel's argument was confined to urging that the trial court reread CACI No. 1204.

The jury's query concerning the special verdict form did not evidence (1) the jury's confusion about the risk-benefit test, (2) an expression of the jury's "desire to be informed of any point of law" concerning that test (§ 614), or (3) a stated need by the jury for a rereading of CACI No. 1204. The trial court was under no obligation to reread that instruction. (See *Gray v. Wagner* (1969) 272 Cal.App.2d 671, 672 ["party is not entitled as a matter of right to have instructions re-read which were not requested by the jury"].) The court did not abuse its discretion in rejecting Lord's request to reread CACI No. 1204 or by failing to provide further guidance—not requested by Lord—to the jury concerning the risk benefit test. (See *Eid*, *supra*, 187 Cal.App.4th at p. 882.)[15]

## B.  Motion for New Trial:  Juror Declarations

### 1.  *Procedural Background*

Lord asserted in his posttrial motions that the trial court erred in failing to instruct the jury concerning the risk-benefit test in response to the jury's query during deliberations, and that the failure to address the jury's "confusion" about the test warranted the granting of a new trial.[16] In asserting this position, Lord relied substantially upon the declarations of two jurors (detailed below).

The trial court, in denying the new trial motion, rejected the challenge by Lord, concluding that it had responded appropriately to the jury's inquiry about the completion of the verdict form. In reaching its decision, the court ruled that the substance of the two juror

---

[15] Because we find no error with respect to the trial court's response to the jury's inquiry during deliberations, we need not address the arguments by the parties on whether the claimed error was prejudicial. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 845, fn. 5 [appellate courts will not address issues whose resolution is unnecessary to the disposition of the appeal].)

[16] Lord raised several other claims of trial court error in his posttrial motion for new trial. Lord does not assert these additional matters on appeal. Therefore, he has abandoned any challenge concerning those other claims. (See *Tiernan v. Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 216, fn. 4.)

declarations were inadmissible because "the statute [Evidence Code § 1150] and caselaw specifically prohibit a court from considering jurors' confusion or misunderstanding of the law, or how they read or interpreted jury instructions."

### 2. *Admissibility of Juror Declarations*

#### a. The Declarations

Lord submitted in his posttrial motions the declarations of Juror V.L. and Juror J.M.

Juror V.L. declared that "[a]ll members of the jury felt that Mr. Lord was entitled to economic compensation due to the injuries he suffered because the helmet failed to protect Mr. Lord. [¶] However, the jury ultimately found for [Bell] because the jury believed that short of having a paper bag on your head any protection would be better than none. In other words, the jury concluded that wearing a helmet that did not work was better than no helmet at all. [¶] For this reason, the jury attempted to obtain guidance from the Court regarding how to apply the risk-benefit test." Juror V.L. stated further: "Had the Court addressed the jury's question regarding the risk-benefit test, I believe that the jury verdict would have been in favor of Mr. Lord." And Juror V.L. stated her personal beliefs that "[1] the jury verdict in this [case] was a miscarriage of justice … [2] no member of the jury felt that the jury verdict was the right one … [and 3] the jury reached a verdict in favor of Bell due to its misinterpretation of the risk-benefit test."

Juror J.M. stated in his declaration that after the jury concluded that there had been no misuse of the helmet, it proceeded to answer Question 3 on the verdict form, namely, "whether the benefits of the helmet's design outweighed the risks of the design. During their deliberation, the jury felt that the answer to that question was yes. However, the jury still felt that Bell might have had some liability. For that reason, the jury submitted a question to the Court in an effort to clarify if this was the correct application of the risk-benefit test." Juror J.M. declared further that "[h]owever, the Court's response signaled to the jurors that the Court was unwilling to provide the jury with further guidance regarding the risk-benefit test and that the jury should issue its verdict."

21

#### b. Standard of Review

A ruling by the trial court on a new trial motion is reviewed for abuse of discretion. (See *Fassberg Construction Co. v. Housing Authority of City of Los Angeles* (2007) 152 Cal.App.4th 720, 752.) And, specifically as to the juror declarations submitted by Lord, a trial court's ruling on the admissibility of evidence in connection with a new trial motion is reviewed for abuse of discretion. (See *Barboni v. Tuomi* (2012) 210 Cal.App.4th 340, 345 (*Barboni*).)[17]

#### c. Discussion

The general principle that applies to the admissibility of the two juror declarations proffered by Lord has been summarized: "Evidence of jurors' internal thought processes is inadmissible to impeach a verdict. [Citations.] Only evidence as to objectively ascertainable statements, conduct, conditions, or events is admissible to impeach a verdict. [Citations.] Juror declarations are admissible to the extent that they describe overt acts constituting jury misconduct, but they are inadmissible to the extent that they describe the effect of any event on a juror's subjective reasoning process. [Citation.] Accordingly, juror declarations are inadmissible to the extent that they purport to describe the jurors' understanding of the instructions or how they arrived at their verdict. [Citations.]" (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124–1125 (*Bell*).)

Evidence Code section 1150, subdivision (a) makes this distinction between (1) admissible evidence concerning a verdict's validity "as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly," and (2) inadmissible evidence "to show the effect of such statement, conduct, condition, or event upon a juror either in

---

[17] Lord argues that the trial court's ruling on the admissibility of the two juror declarations is subject to de novo review. He presents no apposite authority in support of this position, and we find it to be without merit.

influencing him [or her] to assent to or dissent from the verdict or concerning the mental processes by which it was determined."[18]  This statute recognizes the "distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved. …" (*People v. Hutchinson* (1969) 71 Cal.2d 342, 349 (*Hutchinson*).)  Further, the "limitation [on admissibility of evidence under Evid. Code, § 1150] prevents one juror from upsetting a verdict of the whole jury by impugning his [or her] own or his [or her] fellow jurors' mental processes or reasons for assent or dissent.  The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration.  [Citations.]" (*Id.* at p. 350.)

Thus, for example, in *Bell*, a products liability (vehicle rollover) case, a motion for new trial was granted largely based on the declarations of two jurors; the trial court believed the declarations showed "that the jury was misled by the special verdict question and [the court's subsequent] failure to provide proper guidance in response to the jury's question." (*Bell*, *supra*, 181 Cal.App.4th at p. 1125.)  The two declarants described disagreements during the jury's deliberations over "the meaning of the term 'potential risks' as used in the first four questions of the Special Verdict Form.' " (*Ibid.*)  Both declarants stated that their understanding of the term involved a particular risk of the vehicle's occupant striking his or her head during a rollover, while certain jurors believed the term should be interpreted broadly. (*Ibid.*)  One of the juror-declarants stated that after sending a question to the court about the verdict form and receiving the court's response, the majority of the jury urged that

_____

[18] Evidence Code section 1150, subdivision (a) reads:  "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him [or her] to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

the " 'potential risks' " term should be interpreted broadly, resulting in a vote change with a consensus of nine jurors voting to answer a question in the verdict form that resulted in finding for the defendant on a design defect claim. (*Ibid.*) The appellate court held that the declarations were inadmissible because they "reflect[ed] the jurors' subjective reasoning processes." (*Id.* at p. 1126.)

Similarly, in *Ford v. Bennacka* (1990) 226 Cal.App.3d 330, the plaintiff—who was injured in a motorcycle accident and received an adverse judgment on special verdict after a jury trial—filed a motion for new trial asserting jury misconduct in which he "submitted declarations of five jurors essentially asserting the jury confused the concepts of comparative negligence and preponderance of the evidence." (*Id.* at p. 332, fn. omitted.) The trial court denied the motion for new trial and concluded the declarations were inadmissible because they "pointed 'to no act or occurrence but appeared to show the mental processes of the jurors in arriving at the verdict they rendered.' " (*Ibid.*) The appellate court, in concluding the trial court had properly denied the new trial motion, held: "The declarations lack objective and verifiable incidents of juror misconduct. [Citations.] … The declarations do not describe overt acts, statements, or conduct showing the jury intentionally agreed to disregard applicable law and apply inapplicable law. [Citation.] Instead, the declarations at most suggest 'deliberative error' in the jury's collective mental process— confusion, misunderstanding, and misinterpretation of the law." (*Id.* at pp. 335–336; see also *Bly-Magee v. Budget Rent-A-Car Corp.* (1994) 24 Cal.App.4th 318, 325 [four juror affidavits submitted in support of new trial motion indicating that affiants and fellow jurors did not understand special verdict form's reference to "percentage of negligence attributable to 'other persons' " held inadmissible under Evid. Code, § 1150].)

And in *Guernsey v. City of Salinas* (2018) 30 Cal.App.5th 269 (*Guernsey*), the plaintiff was severely injured after being hit by a truck while crossing a driveway in a faded crosswalk and sued the City of Salinas for a dangerous condition of public property. (*Id.* at pp. 271, 274.) After a defense verdict, the plaintiff appealed, asserting, inter alia,

instructional error. (*Id.* at p. 271.) A panel of this court found that instructional error had occurred. (*Id.* at pp. 281–282.) In arguing on appeal that the error was prejudicial, the plaintiff relied on juror declarations that she had submitted in connection with her motion for new trial. (*Id.* at p. 282.) The declarants stated, inter alia, that as they understood the challenged instructions, they were precluded from finding the existence of a dangerous condition. (*Id.* at p. 283.)[19] The *Guernsey* court held that "[n]early all of these statements were inadmissible because they were reflections of the jurors' mental processes. ' "[W]hen a juror in the course of deliberations gives the reasons for his or her vote, the words are simply a verbal reflection of the juror's mental processes. Consideration of such a statement as evidence of those processes is barred by Evidence Code section 1150." [Citation.]' [Citation.] … [¶] The 'mental processes' prohibition applies to juror affidavits conveying jurors' statements about their understanding of certain words in instructions. [Citations.]" (*Ibid.*)

Plainly, the two juror declarations submitted here by Lord were offered as "proof of the subjective reasoning processes of the individual juror," as well as of the jury collectively, which reasoning processes "can be neither corroborated nor disproved. …" (*Hutchinson*, *supra,* 71 Cal.2d at p. 349.) The wording of Juror V.L.'s declaration—such as "[a]ll members of the jury felt," "because the jury believed," "the jury concluded," and "the jury attempted to obtain guidance"—clearly demonstrates expressions about the *subjective* reasoning and thought processes of V.L. and V.L.'s fellow jurors. V.L.'s additional statement that "the jury reached a verdict in favor of Bell due to its misinterpretation of the

---

[19] The declarants' statements bear some resemblance to the two juror declarations presented by Lord here. As explained by this court in *Guernsey*, "The key statements in the juror affidavits upon which Guernsey relies are: (1) the vote on dangerous condition was [9] to [3]; (2) a juror changed his vote because he 'felt outvoted'; … (4) the jury used the instruction to answer questions 2a and 2b; (5) the jury discussed and "agreed" that the instruction did not allow them to find a dangerous condition; and (6) some jurors "stated" that the City was partially responsible." (*Guernsey*, *supra*, 30 Cal.App.5th at p. 283.)

risk-benefit test" is an attempt to explain the collective, subjective reasoning for the jury's verdict; this is clearly prohibited under Evidence Code section 1150. (See *Guernsey*, *supra*, 30 Cal.App.5th at p. 283 [jurors' statements that "the jury discussed and 'agreed' that the instruction did not allow them to find a dangerous condition" held inadmissible under Evid. Code, § 1150].) Likewise, Juror J.M.'s declaration is replete with inadmissible statements concerning J.M.'s and J.M.'s fellow jurors' subjective reasoning—i.e., "the jury felt," "the jury still felt," "[f]or that reason, the jury submitted," "in an effort to clarify," and "signaled to the jurors." The two juror declarations were inadmissible under Evidence Code section 1150, subdivision (a).

Lord contends that *People v. Engstrom* (2011) 201 Cal.App.4th 174 (*Engstrom*) supports his position that the two juror declarations are admissible. There, the defendant was convicted of cultivation of marijuana (Health & Saf. Code, § 11358). (*Engstrom*, *supra*, at p. 177.) A significant issue at trial was whether the defendant's growing operation exceeded the limits for medicinal purposes, which, in turn, was based upon the anticipated yield from the plants. (*Id.* at 178–179.) The defendant's expert witness (Browne) presented a mathematical formula to determine the yield under which the defendant's operation would have been permitted. (*Id.* at 179–180.) After being convicted, the defendant moved for new trial based on jury misconduct, which the court granted. (*Id.* at p. 177.) The defendant's motion included defense counsel's declaration, an affidavit from Browne, and an affidavit from one juror. (*Id.* at p. 181.) The prosecution objected to most of this evidence, asserting that it concerned the thought process of the jury. (*Id.* at p. 182.) The juror, in his or her declaration, "stated the jurors discussed Browne's testimony and his calculations. Juror No. 3 [another juror, who] had an engineering background … [,] indicated he disagreed with the expert's calculations. … Some jurors suggested the yield should be recalculated … [to change Browne's equation]. Juror No. 3 … recalculated the plants' yield. The new figure was discussed and applied during deliberations." (*Id.* at p. 182.) The trial court, while acknowledging that "most juror statements are inadmissible, Evidence Code section 1150

26

did not bar statements which are themselves misconduct. … [It] found one juror disagreed with the defense expert's method of calculating marijuana yield based on that juror's engineering background. It concluded the yield of defendant's marijuana plants was a key issue in the case, and by using a 'new formula,' one which overstated the yield, the jury committed prejudicial misconduct. …" (*Id.* at p. 182.)

The appellate court reversed, concluding that the granting of the new trial based on jury misconduct was error: "[T]he jurors' reasonable, commonsense interpretation and application of the evidence admitted at trial to recalculate defendant's marijuana garden's yield, by substituting a single factor used in an expert witness's formula, is not juror misconduct so long, as here, no extrinsic evidence came into play." (*Engstrom, supra*, 201 Cal.App.4th at p. 188.) On the question of the trial court's consideration of the juror affidavit, the *Engstrom* court recited that the People challenged the evidentiary rulings and the trial court's finding that there was jury misconduct. (*Id.* at p. 183.) But the People (as noted by the appellate court), in effect, admitted that the portions of the juror's affidavit recited, *ante*, were admissible because they "were any statements that might constitute misconduct or statements open to other sources of corroboration such as sight or hearing." (*Ibid.*) The court held that the admission of the juror affidavit was appropriate, reasoning: "[The] affidavit related Juror No. 3's express disagreement with Browne's formulaic calculation, jurors' discussion of his testimony, and how jurors came to substitute a factor in Browne's formula for calculating marijuana yield. Although some of the affidavit is related to the jurors' thought process, it is nonetheless based on external, verifiable conduct and statements rather than a juror's internal thoughts left unexpressed until a motion for new trial." (*Id.* at p. 184.)

Here, unlike in *Engstrom*, the two declarants, Juror V.L. and Juror J.M., were reporting their own thought processes and reasoning—and collectively and generically, the entire jury's thinking and rationale— behind their query to the trial court and their ultimate completion of the special verdict. The jurors' statements were not "based on external,

27

verifiable conduct and statements. …" (*Engstrom*, *supra*, 201 Cal.App.4th at p. 184.) *Engstrom* does not support Lord's position that the trial court erred in excluding the two juror declarations.

Lord also relies on *Drust v. Drust* (1980) 113 Cal.App.3d 1 (*Drust*). In that automobile accident case, the driver of the car in which the injured plaintiff was passenger was sued for negligence, and the plaintiff obtained a $1.436 million jury verdict. (*Id.* at p. 5.) The appellate court reversed the judgment and remanded the case for a new trial on damages only. (*Id.* at p. 11.) It found that in calculating the damage award, "the jury incorrectly included inconsistent elements of damage." (*Id.* at p. 8.) This impropriety was determined by the *Drust* court from the affidavits of all twelve jurors, which were submitted by the *plaintiff* in posttrial proceedings for other purposes but were relied on by the defendant in his appeal. (*Ibid.*) The jurors' affidavits described the three components of the jury's total damage award. (*Id.* at pp. 8, 10.) While the appellate court acknowledged that under Evidence Code section 1150, "posttrial solicitation and use of jurors' statements concerning their conduct and deliberation and which seek to explain the effect of evidence on their mental processes is improper," it held that "use of a juror's affidavit or declaration is proper to disclose objectively ascertainable overt acts by the jury. [Citation.]" (*Drust*, *supra*, at p. 9, citing *Krouse v. Graham* (1977) 19 Cal.3d 59, 80–81.) The court in *Drust* held that the juror declarations at issue were "more susceptible of being interpreted as describing the overt act of awarding a particular sum for a particular element of damage." (*Drust*, *supra*, at p. 9.)[20]

---

[20] The dissent in *Drust* disagreed that consideration of the jurors' declarations was appropriate, concluding that they were a reflection of the mental processes of the jury and thus inadmissible under Evidence Code section 1150. (See *Drust*, *supra*, 113 Cal.App.3d at pp. 12–13; see also *Ferreira v. Quik Stop Markets, Inc.* (1983) 141 Cal.App.3d 1023, 1034 ["*Drust* appears to be an anomaly and is inconsistent with the clear language of Evidence Code section 1150"].)

*Drust*, like *Engstrom*, offers no support for Lord's position. The jury's breakdown of the damages award was, under the particular circumstances of *Drust*—in which the matter was established through declarations from all 12 jurors and where the proponent of the declarations on appeal was not the party who submitted them to the trial court—an "overt act[]" that was "objectively ascertainable." (*Hutchinson*, *supra*, 71 Cal.2d at p. 349.) By contrast, the two juror declarations submitted by Lord were clearly "proof of the subjective reasoning processes of the individual juror" and of the jury as a whole, "which can be neither corroborated nor disproved …" (*Ibid.*)

As the trial court correctly found, the declarations of Juror V.L. and Juror J.M. were inadmissible as statements "concerning the mental processes by which it was determined" proscribed by Evidence Code section 1150. Because the declarations "purport[ed] to describe the jurors' understanding of the instructions or how they arrived at their verdict" (*Bell*, *supra*, 181 Cal.App.4th at p. 1125), they could not be considered in connection with Lord's motion for new trial. The trial court did not abuse its discretion in excluding the declarations. (See *Barboni*, *supra*, 210 Cal.App.4th at p. 345.)[21]

### III.   DISPOSITION

The judgment of August 9, 2024, is affirmed. Statutory costs are awarded to respondent.

---

[21] Lord does not include a discussion identifying which of the seven statutory grounds justified the granting of the new trial motion. (See § 657.) Since his position that a new trial should be ordered is founded upon claims that the court erred in its response to the jury's query and in its erroneous exclusion of the two jurors' declarations—both of which claims we have found to be without merit—we need not address the specific statutory grounds of section 657.

_____
WILSON, J.

WE CONCUR:

_____
GROVER, ACTING P. J.

_____
LIE, J.

*Lord v. Bell Sports Inc.*
**H052707**